Michael W. ROUNDTREE, Appellant,

v.

UNITED STATES, Appellee.

No. 86–1382.

District of Columbia Court of Appeals.

Argued May 9, 1989.
Decided October 2, 1990.

---

Charles A. Kubinski, Washington, D.C. appointed by this court, for appellant.

Thomas C. Black, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, were on the brief, for appellee.

Before NEWMAN, STEADMAN and SCHWELB, Associate Judges.

STEADMAN, Associate Judge:

Appellant was convicted by a jury on one count of sodomy, D.C.Code § 22–3502 (1989), and one count of tampering with physical evidence, *id.* § 22–723. On appeal, he challenges the trial court's refusal to permit him to cross-examine the complaining witness about her previous allegations of sexual assaults by other men. Additionally, appellant claims that the trial court improperly excluded evidence about the condition of the genitalia of the complaining witness, who was allegedly suffering from a venereal disease at the time of the incident. He also contends that the trial court improperly instructed the jury as to the elements of the crime of sodomy. We affirm.[1]

I

On May 12, 1985, appellant, a correctional officer, was on duty at the D.C. Jail. According to Karen Brock, another correctional officer at the Jail, appellant was quite forward that day about his fondness for cunnilingus. Brock testified that she overheard appellant telling a woman named Sheila over the telephone how much he had enjoyed "going down" on her, which Brock understood to mean performing oral sex on her,[2] during the past weekend. Later, according to Brock, appellant, who was "[v]ery flirtatious" and "[c]oming on to" her, said that "going down" on a woman "really turns him on," and that he would like to do so with Brock.[3] Brock rebuffed appellant's advances.

After this rebuke by Brock, appellant's attention apparently shifted to seventeen-year-old W.D., the complaining witness in this case. W.D. was the sole female prisoner in custody in that area of the D.C. Jail at the time.[4] Appellant asked a male prisoner near the female section of the jail if he knew how old the "young lady across the hall" was. He then entered the portion of the jail where W.D. was being held, and, upon his return, said to the male prisoner, "I've got to have her."

W.D. testified that she had been asleep when appellant came to her cell in the female section of the jail, ostensibly to inquire whether she wanted to be released from her cell for some recreation time. After he unlocked and opened W.D.'s cell door, however, appellant grabbed W.D. and started kissing her face and neck. Despite W.D.'s efforts to push him away, appellant lifted her nightshirt, placed his lips around her vagina, and licked her genitalia with his tongue.[5] After engaging in this activity

1. We address appellant's other contentions, which do not warrant extended discussion, in Part V, *infra*. Because the parties have not raised the issue of the legality of appellant's sentence for tampering with physical evidence, we do not rule on the matter. Appellant remains free, however, to file a motion for correction of sentence under Super.Ct.Crim.R. 35(a) (1989).

2. "go down on"—"Slang [Vulgar] to perform fellatio or cunnilingus on." RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED (3d ed. 1987); *accord* R. CHAPMAN, NEW DICTIONARY OF AMERICAN SLANG (1986).

3. Brock's direct examination testimony included the following exchange:

Q: When you say he explained to you what he had done with Sheila that weekend—
A: Yeah, that he had gone down on her and that he had ate her, and this is the kind of sexual things that he likes to do, and this is how—what really turns him on, and he would like to do the same thing to me.

4. W.D. was in custody on charges of solicitation of prostitution. After learning that W.D. was a juvenile, whom the United States had no authority to prosecute, the United States Attorney's Office referred the solicitation charges to the District of Columbia Corporation Counsel. For reasons unrelated to this case, Corporation Counsel ultimately dismissed the charges against W.D.

5. W.D.'s direct examination testimony included the following exchange:

Q: .... You said he went down on you. What physically did he do?
A: He started eating me.
Q: What do you mean by that, physically, what did he do with his body?
A: He was licking on me.
Q: With his tongue?
A: Yes.
Q: What was he licking?
A: My vulva.
Q: Excuse me?
A: My vulva.

for "a couple of minutes," appellant took out his penis, put W.D.'s hand on it, and moved her hand back and forth until he ejaculated into a nearby trash can. Afterwards, appellant wiped himself clean, threw the soiled tissues into the same trash can, and left the female section of the jail.

A few minutes later, W.D. reported the incident to other jail officials, and an investigation ensued. Three jail officials testified that they saw semen and tissues in a trash can near W.D.'s cell. One of the prison officials retrieved the liner from the trash can and placed it in a brown paper bag, which he then stapled shut and labelled "evidence." The official placed the bag on top of a file cabinet in an administrative office in the jail. Soon after, in that same office, appellant was interviewed by his supervisors; they confronted him with the evidence in the bag. At the conclusion of their interview, however, the jail officials left appellant alone in the office with another correctional officer, also appellant's union representative, who did not know of the bag containing evidence. The union representative testified that he saw appellant stumble over a desk in the office and gather up, among other things, a brown bag which had been stapled shut and had writing on it. Another jail official later saw appellant walking by himself with a folded brown bag in his back pocket. Before long, officials discovered that the evidence bag had disappeared, and it was never found. However, during a strip search conducted in an effort to locate the missing evidence, investigating officials did discover semen stains on appellant's underpants.

Appellant's defense was a total denial. Though he admitted entering the female section of the jail and speaking with W.D., he denied having had any sexual contact with her. He also denied having propositioned Officer Brock or having had the phone conversation with Sheila described by Brock. Appellant admitted having a brown paper bag, but claimed he was carrying a chicken sandwich in it. He contradicted himself as to whether the bag had staples in it, and could not remember whether the bag bore any writing on it. His girl friend testified that she and Roundtree had made love during the lunch hour, and he claimed that this explained the presence of semen on his clothing. The prosecutor, who conducted a probing and highly professional cross-examination of Roundtree, exposed numerous contradictions in his account, severely damaging Roundtree's credibility.

## II

Appellant first alleges that the trial court's refusal to permit him to inquire during cross-examination of W.D. about her past allegations of sexual assaults by other men violated his constitutional rights under the confrontation clause of the sixth amendment, or alternatively was an abuse of discretion.

### A.  *The factual background*

During discovery in a civil lawsuit in federal court by W.D. against appellant and the District of Columbia arising out of this incident, appellant learned of and obtained copies of W.D.'s juvenile records from her home state of Minnesota. Those records revealed that W.D. had claimed to have been raped or sexually abused by different men on at least eight occasions. Several allegations involved sexual abuse by family members or boyfriends of family members; others involved sexual assaults committed by pimps.[6] In at least one instance, after initially telling a social worker that she had been sexually abused by her brother Hank, W.D. later denied that any such sexual abuse had occurred.[7] She also gave inconsistent accounts of how frequently her brother had sex with her. On

Q: What part of your body is that?
A: My vagina.
Q: Where were his lips when he started licking around your vagina?
A: Around the outside of my vagina.

---

**6.** The Minnesota records indicate that W.D. began working as a prostitute at a young age.

**7.** In denying that the abuse had occurred, W.D. told the social worker "that she did not want police involvement in [the] matter."

the other hand, the Minnesota records provide partial corroboration of at least some of W.D.'s claims. In May of 1983, W.D. claimed during a medical examination that she had been sexually assaulted by a friend of her sister's. The examining physician's report noted the presence of a "semen-like substance on [the] thighs, mons pubis, and within [the] vagina" of W.D. Additionally, medical tests conducted after a sexual assault which W.D. alleged occurred on January 11, 1985, indicated the presence of sperm on W.D.

The most fully documented incident in the record involved a claim by W.D. that a male counselor at a facility for teen-aged mothers called Juvenile Horizons had placed his hand on her buttocks in an inappropriately sexual manner, a claim denied by the counselor. During the course of a Ramsey County Human Services Department investigation into the matter, two members of the Juvenile Horizons staff and two social workers familiar with W.D. indicated that they did not believe W.D.'s allegation.[8] The Human Services Department officials who investigated the allegation concluded that they were "unable to substantiate" W.D.'s charge, although they felt "that there was reason to suspect that the incident may have occurred."

After the parties had reviewed the contents of the Minnesota records, the government moved *in limine* to preclude any inquiry by the defense into W.D.'s prior allegations of sexual abuse. In response, appellant argued that the prior allegations were probative of W.D.'s credibility.[9] After inspecting the Minnesota materials, the trial court indicated that there was "no basis for inquiry into prior accusations" because there had been no "firm determination" as to whether any of W.D.'s allegations "were false or true." Nevertheless,

8. However, any characterization that all the individuals interviewed in the course of the Department of Human Services investigation disbelieved W.D.'s allegation of sexual assault would overstate the case. Undoubtedly, the psychiatrists and psychologists who interviewed W.D. portrayed her as a deeply troubled person. In their reports, various doctors characterized W.D. as "very angry," "hostile," and prone to "aggressivity and blaming." One doctor indicated that W.D.'s "objective and reality testing is very tenuous and at least moderately impaired," and another stated that W.D. had "lied to the [Juvenile Horizons] staff several times in the past." None of these doctors, however, indicated whether he or she believed or disbelieved W.D.'s claim that a Juvenile Horizons staff counselor had touched her in an inappropriately sexual manner. Nor did Mr. Sabre, a county child protection worker familiar with W.D. and the Juvenile Horizons incident, express disbelief about her claim.

9. As we read it, appellant's credibility argument consists of two components. First, he argued that W.D.'s prior allegations were probative of her character for veracity in making claims of sexual assault. Appellant also argued that the prior allegations were probative of W.D.'s bias against male "authority figures" such as appellant, a prison guard. As we understand it, appellant's bias argument is that W.D.'s prior allegations evidence a desire on her part to wrongly accuse male authority figures of sexual assault, which in turn evidences a bias against such authority figures.

In our view, appellant's bias argument is subsumed within the argument that cross-examination about W.D.'s prior allegations of sexual assault would be probative of her character for veracity in matters of the sort involved in this trial. As is the case with the character for veracity issue, prior allegations of sexual assault would be probative of bias against authority figures only if those allegations were fabricated. *See Jones v. United States,* 516 A.2d 513, 517 (D.C.1986) (questioner must proffer facts sufficient to permit the trial judge to evaluate whether a proposed question is, in fact, probative of bias). Moreover, we find the bias argument considerably less persuasive than the character for veracity argument. For one, the notion that W.D.'s prior allegations, even if false, stem from a bias against male authority figures is extremely tenuous. *See Hawkins v. United States,* 461 A.2d 1025, 1034 (D.C.1983), *cert. denied,* 464 U.S. 1052, 104 S.Ct. 734, 79 L.Ed.2d 193 (1984) (characterizing as "tenuous" the theory underlying attempt by appellant, a taxicab driver on trial for murder, to cross-examine a witness about a prior accident claim she had filed against another taxicab driver in order to show her bias against taxicab drivers). Moreover, we observe that only one of the assault incidents documented in the Minnesota records—the incident involving the Juvenile Horizons counselor—involves an "authority figure" comparable to appellant. Accordingly, for purposes of this appeal, in discussing appellant's attempt to challenge W.D.'s credibility, we focus on whether the trial court erred in precluding appellant from impeaching W.D.'s character for veracity by inquiring into her prior allegations of sexual abuse.

before making a final decision on the issue, the trial court decided to inquire about the prior allegations during a *voir dire* examination of W.D.

On *voir dire*, W.D. testified that she had been sexually abused by her brother Hank; she explained that she had later recanted that charge "because I didn't want my mom to find out and I didn't want the police involved." She reaffirmed her earlier allegation, documented in the Minnesota records, that she had been sexually abused by a friend of her mother's, but explained that she did not report the matter to the police because "my mom was going though a lot of problems and I didn't feel that she would trust me or believe me." W.D. also reasserted that several of the other sexual assaults mentioned in the Minnesota's records, including the incident with the Juvenile Horizons counselor, had in fact occurred.

At the conclusion of the hearing, the trial judge decided to preclude cross-examination about the prior allegations. She made clear that she would have permitted such inquiry had the prior allegations been fabricated. On the basis of the documents and her assessment of W.D.'s testimony, however, the trial court found that "there is no substantial basis for concluding that these assaults are fabrication." Following the trial judge's oral ruling, appellant filed a motion seeking reconsideration. In a brief written order denying that motion, the trial judge emphasized that appellant had failed to "show convincingly" that W.D.'s allegations were false.

### B. *Admissibility of evidence of prior allegations of sexual assault*

Appellant sought to impeach W.D.'s credibility through cross-examination about specific instances of prior conduct—specifically, her prior allegations of sexual assault by other men.[10] He argues that the trial court's failure to permit such cross-examination constituted reversible error. In assessing appellant's contention, we first consider whether the trial court was constitutionally required by the confrontation clause of the sixth amendment to permit inquiry into W.D.'s prior allegations. Finding no such constitutional mandate, we next examine whether the trial court committed an abuse of discretion in precluding cross-examination about those allegations.

### 1. *Constitutional concerns: The confrontation clause*

Appellant argues that the trial court's failure to permit him to cross-examine W.D. about her prior allegations violated his rights under the confrontation clause of the sixth amendment.[11] Appellant's argument appears to be that where a witness who testifies that he or she is the victim of a crime has in the past claimed to be a victim of similar crimes, those prior claims are so probative of the credibility of the witness that the confrontation clause therefore requires the trial court to allow cross-examination about them.

The sixth amendment "guarantees to a defendant in a criminal prosecution the right to be confronted with the witnesses against him." *Lawrence v. United States,* 482 A.2d 374, 376 (D.C.1984) (citing *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974)), and the opportunity to cross-examine government witnesses is central to that right. *Id.* Nevertheless, a criminal defendant's constitution-

---

**10.** Even if appellant had made the showing which would have entitled him, as a constitutional matter, to use W.D.'s prior allegations to impeach her credibility, he could not have used the prior allegations as substantive evidence that W.D. had falsely accused him in this case. The law generally "disfavors the admission of evidence of a person's character in order to prove conduct in conformity with that character" in the matter at issue. *McLean v. United States,* 377 A.2d 74, 77 (D.C.1977); *see also Lee v. United States,* 454 A.2d 770, 775 (D.C.1982), *cert. denied,* 464 U.S. 972, 104 S.Ct. 409, 78

L.Ed.2d 349 (1983). Such evidence is admissible only for purposes of impeaching a witness's character for veracity, *Lee, supra,* 454 A.2d at 775, and only under the narrow circumstances described below.

**11.** The confrontation clause of the sixth amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." U.S. CONST. amend. VI.

al right to cross-examine adverse witnesses "is not without limits." *Reed v. United States*, 452 A.2d 1173, 1176 (D.C.1982), *cert. denied*, 464 U.S. 839, 104 S.Ct. 132, 78 L.Ed.2d 127 (1983). For instance, the proposed line of cross-examination must be relevant to the issues involved in the case. *Gibson v. United States*, 536 A.2d 78, 82 (D.C.1987) ("[t]here is no constitutional right to present irrelevant evidence").[12]

■ In this case, as the trial court correctly noted, W.D.'s past allegations would be probative of her credibility only if they were fabricated.[13] *See Sherer v. United States*, 470 A.2d 732, 738 (D.C.1983) (alleged perjury in another trial probative only if the perjury actually took place), *cert. denied*, 469 U.S. 931, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984); *Hughes v. Raines*, 641 F.2d 790, 792 (9th Cir.1981) (any probative conclusions drawn from rape victim's previous accusation of rape depend on whether the other charge was false).[14] In contrast, if the prior accusations were true, they would not serve as a relevant basis for impeachment. Because the constitution does not require confrontation of witnesses with irrelevant evidence, the very applicability of the confrontation clause in this case depends on W.D.'s prior allegations being false. Under these circumstances, "'the confrontation clause does not prevent the trial court from weighing the [defendant's] offer of proof to determine its probative value to the trier of fact.'" *Sherer*, *supra*, 470 A.2d at 738 (citation omitted).

Where an accused seeks to impeach the credibility of a witness by offering evidence that the witness has made a false claim under similar circumstances, the confrontation clause mandates that the trial court give defendant leave to cross-examine about the prior claim only where it is "shown convincingly" that the prior claim is false. *Id.* at 739 (citation omitted).

■ In *Sherer*, the trial court refused to permit the defendant to cross-examine a witness concerning an alleged incident of perjury. *Sherer*, *supra*, 470 A.2d at 739. In sustaining this ruling, the *Sherer* court specifically agreed with the confrontation clause analysis employed in *Hughes v. Raines*, *supra*. In *Hughes*, a rape case, the defendant wanted to demonstrate that the victim had previously made a false accusation of rape. The court found that the trial court's denial of the defendant's request did not offend the confrontation clause because the offer of proof failed to show convincingly whether the prior accusation was false: "[A]ny conclusions drawn from [the fact of a prior accusation] that would bear on this case would depend upon whether it could be shown convincingly that the other charge was false." *Hughes v. Raines*, *supra*, 641 F.2d at 792.

This court's opinion in *Lawrence v. United States*, *supra*, 482 A.2d 374, does not compel a different conclusion. In *Lawrence*, the court, relying on the confrontation clause, found reversible error in a trial court's refusal to permit the defendant to

12. Additionally, even where a proposed line of inquiry is relevant, the trial court "retain[s] wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986).

13. Indeed, if the allegations were true, and W.D. had been sexually assaulted in the past, inquiry into those episodes would violate the rule that a defendant may not cross-examine a witness about prior sexual acts with others in an attempt to impeach the complainant's general credibility. *See McLean, supra* note 10, 377 A.2d at 78.

14. *See also People v. Neely*, 228 Cal.App.2d 16, 18, 39 Cal.Rptr. 251, 252 (1964) (prior rape complaints not relevant if true); *People v. Makela*, 147 Mich.App. 674, 685–86, 383 N.W.2d 270, 276 (1985) (evidence of prior rape accusation not relevant unless falsely made); *State v. Johnson*, 102 N.M. 110, 118, 692 P.2d 35, 43 (N.M.Ct. App.1984) (prior rape complaints against seven individuals "must be demonstrably false" to pass test for relevance); *State v. Kringstad*, 353 N.W.2d 302, 311 (N.D.1984) (prior charge of rape must "necessarily have been false" to be relevant); *State v. Demos*, 94 Wash.2d 733, 736, 619 P.2d 968, 969 (1980) (evidence of prior reports of rape "did not prove falsity and therefore was irrelevant").

cross-examine a witness to a sexual assault on a minor about "prior false accusations of sexual activity made by [the witness] against other family members." *Id.* at 376. Admittedly, the court in *Lawrence* did not discuss the question of the showing a defendant must make as to the falsity of prior allegations.[15] However, it does not appear that the *Lawrence* court saw itself as deciding a case in which the veracity of the prior allegations was substantially disputed. As the court explained, the issue was whether the trial court violated the defendant's confrontation clause rights by, as argued by the defendant, "preventing exploration into prior *false* accusations" made by a witness, or whether, as the government responded, that the denial was an appropriate exercise of discretion. *Id.* (emphasis added). In other words, we read *Lawrence* as a case premised on the assumption that the allegations at issue were indeed false.[16]

Our conclusion that *Lawrence* did not modify the "shown convincingly" standard articulated in *Sherer* is buttressed by the fact that the *Lawrence* court was aware of, and even cited, the *Sherer* opinion. *Lawrence, supra,* 482 A.2d at 377. To read *Lawrence* otherwise would suggest that the division of the court which decided *Lawrence* had revisited the question decided in *Sherer* about the showing required before a defendant is constitutionally entitled to cross-examine a witness about prior accusations of others. Under *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971), however, the court in *Lawrence* was bound by the decision in *Sherer* and could not reconsider that question. We think the best interpretation of *Sherer* and *Lawrence,* read together, is that where a witness has previously made allegations similar to those he or she testifies to at trial, cross-examination about those prior allegations is constitutionally mandated only where they are "shown convincingly" to be false.

In this case, after reviewing the Minnesota records and observing W.D.'s testimony first hand, the trial court concluded that appellant had not "convincingly" shown that W.D.'s prior allegations of sexual assault were false.[17] We agree that appellant's proffer fell far short of the standard required to sustain a contention that cross-examination about those allegations was constitutionally mandated.[18]

### 2. Trial court discretion

Having determined that the refusal to permit appellant to cross-examine W.D.

**15.** The court simply quoted the discretion-guiding standard for permitting cross-examination into a witness's prior bad acts, discussed below. *Lawrence, supra,* 482 A.2d at 377.

**16.** Our review of the briefs filed with this court in the *Lawrence* case confirms that the government took the position that the trial court exclusion of cross-examination about the witness's prior accusations of sexual misconduct would have been proper even if those accusations were in fact false. The government's understanding of the issue in *Lawrence,* as indicated in its brief, was whether "the trial court's refusal to permit cross-examination ... relating to *prior false accusations* of sexual misconduct by [a witness] denied [appellant] his Sixth Amendment right to confront the witnesses against him." Brief for Appellee at 11–12, *Lawrence, supra* (No. 82–1404) (emphasis added). Without suggesting that the accusations were in fact true, the government rejoined by arguing that "the trial court properly exercised its discretion in excluding *such collateral evidence* because it had little or no probative value." *Id.* at 12 (emphasis added). In its elaboration of this contention, the government argued that "even if the jury could have concluded that the prior charge was false, 'the relevance of that conclu-

sion to the case is slight,'" *id.* at 14 (citation omitted), and suggested that "[e]ven if [the witness] had made the allegedly false accusations ... the prejudicial effect of the proposed cross-examination would have clearly outweighed its probative value." *Id.* at 15. Given the manner in which the parties presented the issues, and the fact that the trial court made no determination about the truth or falsity of the witness's accusations, we believe that the *Lawrence* court perceived itself as deciding whether a trial court's decision to preclude as collateral cross-examination about concededly false prior allegations of sexual misconduct constituted reversible error.

**17.** Indeed, the trial court found that defendant's proffer failed to establish even a "substantial basis" for concluding that W.D. had fabricated her prior claims of sexual assault.

**18.** *See also State v. Anderson,* 211 Mont. 272, 284, 686 P.2d 193, 200 (1984) (confrontation clause not violated by requirement that prior sexual assault allegations be proven false before defendant may cross-examine about them).

about her prior allegations did not violate the confrontation clause, we next consider whether the trial court's ruling was otherwise erroneous. Here, because evidence of W.D.'s prior allegations would have been probative only if the allegations were false, appellant's request to cross-examine about those allegations must be doctrinally analyzed in the context of the evidentiary rules governing impeachment of witness credibility with specific instances of bad conduct. For purposes of this analysis, W.D.'s allegedly false prior accusations would constitute the bad conduct. Our evidentiary rules on the impeachment of witness credibility provide that a witness may be cross-examined about a prior bad act that has not resulted in a criminal conviction only where, at a minimum:

> (1) the examiner has a factual predicate for such question, and (2) the bad act "bears directly upon the veracity of the witness in respect to the issues involved [in] the trial."

*Sherer, supra,* 470 A.2d at 738 (citations omitted).[19] The two-part *Sherer* standard constitutes a minimum threshold for the admissibility of proposed cross-examination into alleged prior bad acts, and evidence which fails to satisfy the *Sherer* test may not be admitted.

██ In applying the rules pertaining to the impeachment of witnesses with specific instances of bad conduct, the trial court is vested with broad discretion. First, notwithstanding the fact that a party proposing cross-examination claims to have a "factual predicate" for inquiry into prior bad acts, the trial court may assess the questioner's offer of proof to determine whether such a factual predicate exists. *See Sherer, supra,* 470 A.2d at 739 (trial court did not abuse discretion in precluding cross-examination into prior testimony where defendant's offer of proof that the statements were false was "scanty"); *cf.*

*Hollingsworth v. United States,* 531 A.2d 973, 981 (D.C.1987) ("trial court has broad discretion when ruling on the relevance of evidence"). Second, even where proposed cross-examination satisfies the two-part *Sherer* test, in the absence of confrontation clause concerns, the trial court retains its "broad discretion" generally to control the scope and extent of cross-examination. *In re C.B.N.,* 499 A.2d 1215, 1218 (D.C.1985); *see also Reed, supra,* 452 A.2d at 1176; *Smith v. United States,* 392 A.2d 990, 993 (D.C.1978). In the exercise of this discretion, the court has wide latitude to "impose reasonable limits" on cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall, supra* note 12, 475 U.S. at 679, 106 S.Ct. at 1435. With regard to prejudice, the court may preclude a proposed line of cross-examination "if it appears that the danger of unfair prejudice will outweigh its probative value." *Lee, supra,* note 10, 454 A.2d at 775. *See also Goldman v. United States,* 473 A.2d 852, 856 (D.C.1984); *Brown v. United States,* 409 A.2d 1093, 1099–1100 (D.C.1979). And as is true even in confrontation clause situations, the trial court may also weigh the "probable effect on fair and efficient conduct of the trial." *Sherer, supra,* 470 A.2d at 738 (citation omitted). This court will not reverse such decisions unless the trial court abuses its discretion. *Brown, supra,* 409 A.2d at 1100.

In exercising discretion whether to permit cross-examination into prior allegations of sexual assault, the precise probative value of such evidence, even where it clears the "factual predicate" component of the *Sherer* threshold, will depend upon the degree of certainty with which the trial court can conclude that the prior allegations were false.[20] The stronger the evidence

---

**19.** "These impeachment rules should not be confused with the analytically distinct doctrine that restricts the introduction, as substantive evidence, of an accused's prior crimes or bad acts." *Sherer, supra,* 470 A.2d at 738 n. 5 (citing *Campbell v. United States,* 450 A.2d 428 (D.C.1982); *Drew v. United States,* 118 U.S.App.D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964)).

**20.** Of course, if the degree of certainty is such that the defendant has shown convincingly that the prior allegations are false, the confrontation clause mandates that the defendant be allowed to inquire about those allegations.

that the allegations are false, the greater the probative value. As a countervailing concern, cross-examination into prior allegations of sexual assault is likely to generate considerable prejudicial consequences. First, some prejudice results whenever cross-examination "probes into the private life" of a complainant in a sexual assault case. *See Meaders v. United States*, 519 A.2d 1248, 1254 (D.C.1986). *See also State v. Anderson, supra*, 211 Mont. at 286, 686 P.2d at 201 (evidence of prior allegations "place[s] a prejudicial stamp on [the complainant's] general character and reputation"). Second, evidence of a complainant's prior allegations of sexual assault "diverts the jury's attention to collateral matters." *McLean, supra* note 10, 377 A.2d at 77.[21]

*See also State v. Johnson, supra*, 102 N.M. at 118, 692 P.2d at 43 ("the focus would be on whether the prior charges were 'unsubstantiated,' in effect putting the complainant on trial as to the truthfulness of any complaint to the police which did not result in arrest or conviction").

■ Here, the trial judge acted within her discretion in precluding cross-examination about W.D.'s prior allegations of sexual assault.[22] As indicated, the trial court determined, following *voir dire*, that there was "no substantial basis" for concluding that W.D. had fabricated her prior claims of sexual assault. As a result, the proposed line of impeachment was of limited probative value at best.[23] The prejudicial

21. *McLean*, which presumptively proscribes examination of the complaining witness about her sexual history and reputation, does not deal with the issue of other allegations of sexual assault and therefore, as the trial court recognized, does not in itself preclude questioning in that area. *Cf. Commonwealth v. Bohannon*, 376 Mass. 90, 95, 378 N.E.2d 987, 991 (1978) (rapeshield statute does not apply to prior allegations of sexual assault). *McLean* does, however, illustrate the need for special sensitivity in deliberating on the question of prejudice in the decision whether to allow such interrogation and the scope thereof. *See also Brewer v. United States*, 559 A.2d 317, 320–21 (D.C.1989), *cert. denied,* ── U.S. ──, 110 S.Ct. 1163, 107 L.Ed.2d 1066 (1990); *Meaders, supra*, 519 A.2d at 1254.

22. We would not agree with a suggestion that the trial judge was insufficiently cognizant of her discretion when she precluded cross-examination about W.D.'s prior allegations. A trial judge abuses discretion where he or she fails "to exercise choice in a situation calling for choice." *Johnson v. United States*, 398 A.2d 354, 363 (D.C. 1979). Throughout the several bench conferences and in her written order denying the motion for reconsideration, the trial judge reflected an awareness of discretionary factors. The trial judge, in orally ruling against cross-examination, noted that there was "no substantial basis" for concluding that W.D. fabricated her account of prior sexual assaults. She clearly implied, however, that she might have permitted the proposed cross-examination had appellant established some further factual basis of falsity, even though, as the trial court knew, the *Sherer* standard requires cross-examination only where a defendant shows "convincingly" that a witness's prior allegations are false. (It is worth noting that the trial court's comment that the defendant had not "show[n] convincingly" that the reports were false was made in dealing with a motion for reconsideration and was thus consistent with the test of when their use was

mandated.) The fact that the trial judge indicated she would have allowed cross-examination about W.D.'s prior allegations under circumstances in which *Sherer* does not compel such cross-examination demonstrates both the trial judge's awareness of her "right to exercise choice" and the actual exercise of that choice. *Id.* As such, the trial judge's ruling was made in the exercise of discretion, not under an assumption that cross-examination about W.D.'s prior allegations was precluded as a matter of law. Moreover, the trial judge recognized that *McLean* and *Sherer* did not set absolute preclusionary limits. In both her oral ruling and the written order denying reconsideration, she ruled that the proposed cross-examination "should" not be made. Finally, in both the oral discussions and in the written order, the trial judge expressed concern about other factors which would properly inform a discretionary decision, including the likelihood that inquiry into W.D.'s "apparently troubled adolescence" would result in prejudice to her, as well as the danger that the proposed inquiry would go "afield to another event and another time" or "divert jury attention from the instant case."

23. We need not decide whether appellant's proffer in this case established a "factual predicate" to satisfy the *Sherer* threshold. Nor need we decide whether the trial court, in deciding whether a factual predicate exists, is to make its own factual determination, *see* D.C.Code § 17–305(a) (1989) (trial court finding binding unless plainly wrong or without evidence to support it), or is simply to determine what a reasonable jury might find, *cf. Huddleston v. United States*, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988) (trial court may discretionarily admit evidence of defendant's prior bad act if there is sufficient evidence to support a jury finding that defendant committed the act); *but see Groves v. United States*, 564

effect of the proposed inquiry, in comparison, was considerable. The cross-examination sought by appellant would have probed into extremely private and potentially humiliating aspects of W.D.'s life. Moreover, in this case the risk of distracting the jury with collateral matters was particularly acute. Appellant's proposed line of cross-examination would have diverted the jurors' attention away from the incident in the D.C. Jail and would have invited them instead to focus their energies on assessing the veracity of each of W.D.'s prior claims of sexual assault.[24] Accordingly, we conclude that the trial court acted within its

discretion in precluding appellant from inquiring on cross-examination about W.D.'s prior allegations of sexual assault.[25]

We do not think that this position necessarily conflicts with the opinion in *Mintz v. Premier Cab Ass'n*, 75 U.S.App.D.C. 389, 127 F.2d 744 (1942). In *Mintz*, the trial court permitted the defendant in a personal injury action to ask the plaintiff on cross-examination whether she had "made claim for injuries" in two previous unrelated accidents. 75 U.S.App.D.C. at 389, 127 F.2d at 744. The appellate court affirmed the trial court's decision to admit evidence of prior

A.2d 372, 375 & n. 5 (D.C.1989), *modified,* 574 A.2d 265 (D.C.1990). Even assuming that a factual predicate existed in this case, the trial court nevertheless acted within its discretion in prohibiting the proposed cross-examination in view of its limited probative value and the danger of prejudice and distraction it posed. See *supra* note 22.

**24.** During pretrial proceedings, defense counsel made clear that his proposed digression from events in the D.C. Jail would go well beyond merely cross-examining W.D. about her prior allegations of sexual assault. For example, he sought leave from the trial court to call the Juvenile Horizons counselor as a witness so the counselor could deny W.D.'s allegation that he touched her in an inappropriately sexual manner. The trial court expressly noted its concern about going "afield to another event and another time" on such collateral issues. Because we hold that the trial court acted within its discretion in precluding cross-examination about W.D.'s prior allegations, we need not resolve whether such extrinsic evidence could have been presented. *Lawrence, supra,* 482 A.2d at 377.

**25.** It is true that courts in several jurisdictions apparently require inquiry into prior allegations whenever the defendant demonstrates only a good faith factual basis for concluding that the allegations are false, *see, e.g., Bohannon, supra* note 21, 376 Mass. at 95, 378 N.E.2d at 991. We note that in many other jurisdictions, however, courts have affirmed discretionary trial court refusals to allow cross-examination where the defendant failed to provide sufficient evidence to establish that prior allegations were in fact false. *See, e.g., Covington v. State,* 703 P.2d 436, 442 (Alaska Ct.App.) (defendant "did not establish the falsity of the alleged prior complaints"), *partially reversed on rehearing on other grounds,* 711 P.2d 1183 (Alaska Ct.App.1985); *State v. Hutchinson,* 141 Ariz. 583, 587, 688 P.2d 209, 213 (Ariz.Ct.App.1984) (defendant failed to produce "sufficient facts to show that the prior charge was unsubstantiated"); *People v. Alexan-*

*der,* 116 Ill.App.3d 855, 861, 72 Ill.Dec. 338, 342, 452 N.E.2d 591, 595 (defendant was "unable to show prior complaints were unfounded"); *State v. Anderson, supra* note 18, 211 Mont. at 285, 686 P.2d at 200 (defendant's proffer did not "establish whether there is sufficient support for the contention that the prior allegations are false"); *State v. Kringstad, supra* note 14, 353 N.W.2d at 311 (defendant did not produce "quantum of evidence sufficient to establish the falsity of the previous charge"); *State v. Johnson, supra* note 14, 102 N.M. at 117, 118, 692 P.2d at 42, 43 (defendant's evidence did not establish that prior allegations were "demonstrably false"); *State v. Sieler,* 397 N.W.2d 89, 92 (S.D.1986) (defendant failed to establish that prior charges were "demonstrably false"); *State v. Padilla,* 110 Wis.2d 414, 426, 329 N.W.2d 263, 270 (Wis.Ct.App.1982) (defendant established "no proof of prior untruthful allegations"). Courts have employed a similar approach in cases involving introduction of evidence of—not cross-examination into—prior allegations of sexual assault. *See, e.g., Little v. State,* 413 N.E.2d 639, 643 (Ind.Ct.App.1980) (complainant's other accusations of rape were not "demonstrably false"); *State v. Demos, supra* note 14, 94 Wash.2d at 736, 619 P.2d at 969 (evidence of prior allegations "did not prove [their] falsity"). Indeed, even in Massachusetts, where the *Bohannon* case was decided, courts have upheld trial court refusals to permit cross-examination about prior allegations, despite the fact that the defendant had a good faith basis for such inquiry: "While counsel had what to *him* was a good faith reason to seek inquiry [about two allegedly false accusations made by the complainant against others], the judge acted within his discretion in rejecting the offer of proof as insufficient to merit further inquiry." *Commonwealth v. Hicks,* 23 Mass.App.Ct. 487, 492, 503 N.E.2d 969, 973 (1987) (emphasis in original). *See generally* Annotation, *Impeachment or Cross-Examination of Prosecuting Witness in Sexual Offense Trial by Showing that Similar Charges Were Made Against Other Persons,* 71 A.L.R.4TH 469 (1989).

claims under the claim-minded plaintiff principle. We read *Mintz* as permitting, not requiring, the trial court to allow cross-examination under this principle where it determines that the proffered evidence "may create prejudice but is believed to be worth more than it costs." *Id.* at 390, 127 F.2d at 745.[26]

Furthermore, the *dictum* in *Mintz* suggesting the principle's application to sexual assault cases is of dubious validity today.[27] In the era when the *Mintz* court suggested application of its cost-benefit calculus to sexual assault cases, the legal system operated under the assumption that it was also "worth more than it costs" in effect to put the victim on trial in rape cases; the rules of evidence at the time permitted a defendant, under the guise of cross-examination on the issue of consent, to grill his victim about virtually her entire sexual history and reputation. *See* Berger, *Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom*, 77 COLUM.L.REV. 1, 12–15 (1977); *see also, e.g., Packineau v. United States*, 202 F.2d 681, 684–87 (8th Cir.1953) (holding that trial court erred in excluding evidence of complaining witness' "concupiscence—of her having sexual lust and unlawfully indulging in it" with another man). As this court's opinion in *McLean v. United States* makes clear, courts today accord much more weight to the prejudicial aspect of inquiry into a rape victim's sexual history than did courts a half-century ago; in this jurisdiction, such prejudicial inquiry is no longer deemed to be worth more than it

costs. *McLean, supra* note 10, 377 A.2d at 77–78. For similar reasons, we think that, absent confrontation clause concerns, the prejudice inherent in cross-examination about a complainant's prior allegations of sexual assault[28] precludes us from requiring the trial court under the *Mintz* principle to allow cross-examination of the victim in a sexual assault case about her prior allegations of sexual assault regardless of their truth or falsity.[29]

In sum, under all the circumstances of this case, we conclude that the trial judge committed no reversible error in precluding appellant from cross-examining W.D. about her prior allegations of sexual assault.

### III

■ Appellant next contends that the trial court abused its discretion in refusing to permit a physician to testify about the results of a medical examination he conducted on W.D. Appellant intended to have the doctor testify that the examination revealed no "bruises, redness, swelling, [or] lacerations" on W.D.'s genitalia. Appellant also sought to show through the doctor's testimony that W.D. was suffering from a venereal disease, and that a symptom of that disease was the presence of a "cheesy white extrudance" or a "heavy discharge" in her genital area. The trial court excluded as irrelevant medical testimony "concerning any disease."

---

**26.** As we stated in *United States v. Mosby*, 495 A.2d 304, 305 (D.C.1985): "Although the government cites cases where courts found no abuse of discretion in the admission of certain evidence, those holdings cannot be read to mean that the trial courts were required to admit the evidence in those instances."

**27.** In *dicta* illustrating the scope of permissible inquiry under the "claim-minded plaintiff" principle, the *Mintz* court suggested that "the prosecuting witness in a rape case may be asked whether she has made similar charges against other men." *Mintz, supra*, 785 U.S.App.D.C. at 389–90, 127 F.2d at 744–45.

**28.** *See supra* p. 324.

**29.** The *Mintz* court, without any empirical justification, included sexual assault among a cate-

gory of "[f]ortuitous events [which] are less likely to happen repeatedly than once." *Mintz, supra*, 75 U.S.App.D.C. at 389, 127 F.2d at 744. Under this view, the mere fact that a woman reports a sexual assault on more than one occasion gives rise to an inference that she has fabricated those reports. For someone in W.D.'s circumstances, at least, we find this assumption extremely dubious. W.D., who was described by one Minnesota school official as "one of the most severe victims of chronic emotional and physical neglect I have ever encountered," grew up in an obviously troubled home environment and had resorted to prostitution at a young age. In light of W.D.'s family situation and her circle of associates, the mere number of sexual assaults she has reported does not readily give rise to any inference that those assaults did not occur.

Before us, appellant urges that such evidence "could have influenced the jury's mind on the creditability [sic] of [the complaining witness]." At trial, however, appellant did not make clear precisely for what purpose he offered the evidence of W.D.'s medical condition. Initially, during pre-trial proceedings, appellant had sought leave to introduce evidence that he was aware of the fact that W.D. was in the D.C. Jail following her arrest on prostitution charges. This was relevant, appellant argued, on the theory that he would not have engaged in any sexual acts with W.D. because "he knew that prostitutes many times carry venereal diseases and this would in his own mind create the idea that he would not want to do this to her." It was in this context that appellant first mentioned evidence that W.D. was suffering from a venereal disease at the time of the incident: "[T]he truth of the matter," defense counsel argued, "is that according to the medical records she had some sort of infection at the time that this happened. So, [appellant's] thought that she might be diseased or unclean is not a fanciful thought." In other words, appellant initially suggested to the trial court that evidence of the mere *presence* of the disease was relevant as proof of his state of mind —namely, that his fear of contracting diseases often carried by prostitutes would have deterred him from seeking to engage in any sexual conduct with W.D.

Later, at trial, prior to the presentation of the defense case, appellant again raised the question of W.D.'s medical condition. This time, defense counsel indicated he wished to have the doctor's testimony include "the condition of her sexual organ." Defense counsel's proffer as to the relevance of evidence of the "cheesy white extrudance," however, was still somewhat unclear: "[T]he Government would have the jury believe [Mr. Roundtree] came in there, committed the act without even—according to the doctor, my conversation with the doctor, the doctor agrees that there

was a heavy discharge." The trial court ruled that it "would exclude testimony concerning any disease and finds as represented that it would appear to be irrelevant in this case."

Contrary to appellant's initial assertion before the trial court, in light of his defense at trial, the presence in W.D. of a venereal disease would not have been relevant on the issue of appellant's state of mind—*i.e.*, whether he feared W.D. suffered from a venereal disease and thus would be unlikely to sexually assault her. Throughout trial, appellant consistently maintained that he never had any physical contact with the victim. Because he claimed that he was never in a situation where he could have observed symptoms manifesting the fact that W.D. had a venereal disease, the actual presence or absence of such a disease or its symptoms would have had no bearing on his state of mind.[30] Nor would the fact that W.D. actually suffered from a venereal disease be relevant as to the reasonableness of appellant's *ex ante* belief that she might suffer from such a disease. Thus, given appellant's defense at trial, to the extent he offered the evidence of W.D.'s disease and its symptoms to prove that his fear of contracting a venereal disease would have dissuaded him from sexually assaulting W.D., the evidence was irrelevant.

■ Evidence of the *physical appearance* of W.D.'s genitalia, regardless of cause, might have been relevant, however, on the question of her credibility. This is true even in light of appellant's defense at trial. If, as appellant suggests, the symptoms of W.D.'s disease would have made oral sex unpleasant and therefore unlikely to occur, this evidence could be somewhat probative of the credibility of her account of the sodomy. As such, it might have made a jury somewhat more likely to believe appellant's version of events, *i.e.*, that no oral sexual contact occurred.[31]

**30.** Our conclusion might be different if appellant had contended that he approached the complainant, discovered the symptoms of her illness, and was then dissuaded from performing

sodomy, or otherwise had an opportunity to observe the appearance of W.D.'s genitalia.

**31.** Such evidence may be relevant for this purpose even though appellant contends he never

Here, appellant's proffer did not make entirely clear to the trial judge that he was not merely reiterating his request to introduce evidence of the *presence* in W.D. of a venereal disease as proof of his state of mind, for which it was irrelevant, but was instead seeking to introduce the evidence of the *physical appearance* of the disease to challenge W.D.'s credibility, for which it could be relevant. *Cf. Jones v. United States, supra* note 9, 516 A.2d at 517 (affirming trial court's restriction on cross-examination about a witness's bias because of an insufficient factual proffer).[32] The nature of appellant's proffer perhaps explains the trial court's ruling that "the Court would exclude testimony concerning any disease and finds *as represented* that it would appear to be irrelevant in this case."[33] Nevertheless, because we ordinarily do not require an " 'exhaustive proffer' " as a prerequisite to the admission of

evidence, *id.* (citation omitted), we will assume the issue of the admissibility of the external appearance of W.D.'s genitalia on the issue of her credibility was sufficiently presented to warrant appellate review.

An evidentiary ruling by a trial judge on the relevancy of a particular item is a "highly discretionary decision" that will be upset on appeal only upon a showing of "grave abuse." *Mitchell v. United States,* 408 A.2d 1213, 1215 (D.C.1979) (citations omitted). *See also Mosby, supra* note 26, 495 A.2d at 305. However, even on the assumption that the relevancy ruling was in error in its application to the physical appearance of the genitalia, we do not perceive grounds for reversal, since we think we can say with fair assurance that any such presumed trial court error did not substantially influence the jury's determination. *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90

---

had any contact with W.D.'s genitals. Consider an analogous case. Imagine that Plaintiff alleges that Defendant assaulted him by grabbing him and pinning him to the ground for an hour. Plaintiff alleges that the incident occurred on January 1, 1990, on the grounds near the Washington Monument. Defendant, a person of average size, claims that he was in his apartment all day on January 1, that he never went near the Washington Monument, and that he never even saw Plaintiff, much less pinned him to the ground. Defendant's theory is that Plaintiff has fabricated the entire account. At trial, Defendant seeks to introduce the testimony of Witness, who will state that Plaintiff, unbeknownst to Defendant at the time of the alleged assault, is a world class wrestler who won an Olympic gold medal in his weight division. Defendant does not claim he sought to pin Plaintiff but was unable to do so because of Plaintiff's wrestling prowess. Nevertheless, evidence of the Plaintiff's wrestling ability makes it more unlikely that events occurred in the manner claimed by Plaintiff; it makes Defendant's version of events on January 1 more credible.

In this hypothetical, Witness's evidence affects Plaintiff's credibility because it suggests Defendant would have been *incapable* of committing the acts alleged. The medical evidence proffered in this case, in contrast, affects W.D.'s credibility because it suggests appellant would have been *disinclined* to commit the acts alleged. While evidence of a defendant's disinclination to commit an offense is certainly less probative of a plaintiff's credibility than is evidence of a defendant's inability to commit an offense, it nevertheless may be sufficiently pro-

bative to be deemed relevant. *See* E. CLEARY, McCORMICK ON EVIDENCE § 185, at 542 (3d ed. 1984) (evidence is relevant if it "could reasonably show that a fact is slightly more probable than it would appear without that evidence"); *see also* FED.R.EVID. 401 (relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

**32.** *Cf. Miller v. Avirom,* 127 U.S.App.D.C. 367, 370, 384 F.2d 319, 322 (1967) ("points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal" (footnote omitted)).

**33.** However, the court left the ruling subject to revision and stated that defense counsel could renew his motion to introduce the evidence at a later time.

Defense counsel, without expanding on the proffer, twice renewed the motion. The second time, the motion immediately followed this exchange between appellant and his lawyer:

Q: Do you commit oral sex on prostitutes?
A: No, I don't.
Q: Any particular reason why not?
A: I don't commit oral sex, period. I mean, I do have some godliness about myself, you know.

The trial court ruled: "It appears, particularly in light of the last answer, that the doctor's testimony will not be relevant." Even then, defense counsel did not amplify the rationale for his proffer.

L.Ed. 1557 (1946).[34] As indicated above, the appellant never suggested that he in any way saw the appearance of W.D.'s genitalia. His defense was a flat denial of all the significant events testified to by the prosecution witnesses: the conversation with the female prison guard about his particular sexual desires, the sodomy of W.D., the masturbation event, and the destruction of evidence. W.D.'s was not the only testimony to contradict appellant's story. That he lied as to three of these events was convincingly shown by the evidence apart from W.D.'s testimony. Thus, appellant stood as a largely discredited witness, and no reason was apparent why W.D. would have told the truth as to part of appellant's actions and lied about the cunnilingus.

The marginal relevance of the evidence is further illustrated by appellant's own difficulty in articulating any legitimate basis for its admission, as indicated above. Moreover, the record on appeal contains no significant elaboration of the proposed testimony beyond the sketchy description orally given to the trial court.[35] And although the trial court never explicitly reached the issue, a ruling excluding the evidence on a balancing of prejudice versus probative value could have been sustained. *See, e.g., Swinson v. United States*, 483 A.2d 1160, 1164 (D.C.1984).

In sum, in light of all the circumstances, we do not think that the trial court's ruling with respect to the proffered testimony warrants appellate reversal for a new trial.

## IV

Appellant next asserts that cunnilingus,[36] at least on the evidence here, does not violate the D.C. sodomy statute.[37] For over fifteen years, it has been established

---

**34.** Although acknowledging that the question is one of "abuse of discretion," appellant asserts a "fundamental right to call witnesses in his own behalf," citing *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1975), *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), and *Brown v. United States*, 409 A.2d 1093 (D.C.1979). We are presented here, however, with a common sort of relevancy ruling in a trial in which the defendant presented a wide range of evidence. We do not think the trial court's ruling implicates the asserted "fundamental right" which would call into application the constitutional standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See Giles v. United States*, 432 A.2d 739, 746 and n. 13 (D.C.1981) (applying *Kotteakos* non-constitutional error review in case where trial court erroneously permitted use of hearsay evidence and defendant contended that admission of the evidence "violated the confrontation clause of the Sixth Amendment"). *See also California v. Green*, 399 U.S. 149, 173, 186, 90 S.Ct. 1930, 1943, 1949, 26 L.Ed.2d 489 (1970) (Harlan, J., concurring) (observing that neither confrontation nor due process clause has been or should be seen to constitutionalize evidentiary rules of hearsay). *Cf. Springer v. United States*, 388 A.2d 846 (D.C. 1978) (once defendant has been afforded opportunity for sufficient cross-examination, trial court's evidentiary rulings fall within its discretion and are not subject to constitutional error review).

**35.** The relevant portions of the proffer were as follows: "There was a cheesy white extrudance (sic) on the—I cannot read that word." Trial counsel was apparently reading from a medical report, not included in the appellate record. Subsequently trial counsel referred to "that cheesy extrusion on the vulva" and stated that "according to the doctor, my conversation with the doctor, the doctor agrees that there was a heavy discharge."

**36.** In *United States v. Cozart*, 321 A.2d 342 (D.C. 1974), the court adopted the definition of cunnilingus as "'an act of sex perversion committed with the mouth and the female sexual organ.'" *Id.* at 343 n. 3 (quoting BLACK'S LAW DICTIONARY 456 (4th ed. 1968)). *See also* 70A AM.JUR.2D *Sodomy* § 22, at 1053 n. 29 (1987) (defining cunnilingus as "oral vaginal contact or the touching of the female organ with the mouth or tongue") and cases cited therein.

**37.** D.C.Code § 22–3502 (1989) provides, in pertinent part:

(a) Every person who shall be convicted of taking into his or her mouth or anus the sexual organ of any other person or animal, or who shall be convicted of placing his or her sexual organ in the mouth or anus of any other person or animal, or who shall be convicted of having carnal copulation in an opening of the body except sexual parts with another person, all be fined not more than $1,000 or be imprisoned for a period not exceeding 10 years.... [I]n any indictment for the commission of any of the acts, hereby declared to be offenses, it shall not be necessary to set forth the particular unnatural or perverted sexual practice with the commission of which the defendant may be charged, nor to set forth the particular manner in

in this jurisdiction that "cunnilingus is a sodomitic act which is within the purview of § 22–3502." *United States v. Cozart, supra,* 321 A.2d at 343 (footnotes omitted). This holding, of course, is binding upon us as a division, and we must proceed from that postulate. *M.A.P. v. Ryan, supra,* 285 A.2d at 312.[38] Appellant contends, however, that even if cunnilingus does constitute sodomy, penetration is a necessary element of the offense. Under appellant's interpretation, the trial court would be required to instruct the jury that to prove the offense of oral sodomy on a woman, the government must prove either that the defendant placed his or her tongue within the labia or inside the vagina of the complaining witness, or that her genitalia penetrated the defendant's mouth.[39] We do not read the statute as imposing such a requirement.[40]

Appellant's argument relies heavily on D.C.Code § 22–3502(b), which provides: "Any penetration, however slight, is sufficient to complete the crime specified in this section. Proof of emission shall not be necessary." However, that provision does not mandate the interpretation pressed by appellant. The reference to "emission" in section 3502(b) indicates that that provision refers to forms of sodomy involving a penis.[41] In contrast, where a defendant is charged with performing oral sodomy on a woman's genitalia, the "penetration" language of section 3502(b), is inapplicable. Consequently, section 3502(b) does not require the government in such cases to prove either that the complaining witness's genitalia penetrated the mouth of the defendant, or that the defendant's tongue penetrated the complainant's genitalia.[42] Nor, given that under *Cozart* cunnilingus

which said unnatural or perverted sexual practice was committed....

(b) Any penetration, however slight, is sufficient to complete the crime specified in this section. Proof of emission shall not be necessary.

**38.** Prior to 1948, sodomy was not statutorily defined in the District of Columbia, and prosecutions for the offense proceeded under the common-law definition. S.Rep. No. 1377, 80th Cong., 2d Sess., *reprinted in* 1948 U.S.Code Cong. Serv. 1714, 1717 (incorporating House Report) ["Senate Report"]. At common law, the offense of sodomy among human beings was limited to anal copulation. *See* 3 C. Torcia, Wharton's Criminal Law § 295, at 77 (14th ed. 1980); *Rose v. Locke,* 423 U.S. 48, 53, 96 S.Ct. 243, 246, 46 L.Ed.2d 185 (1975) (Brennan, J., dissenting). Both the language of the current sodomy statute and its legislative history, however, indicate that Congress, in enacting section 3502, sought to expand the class of prohibited sexual practices. The statute itself contains the phrase "unnatural or perverted sexual practice," a category of acts broader than those proscribed by the common-law offense. Additionally, according to the Senate Report accompanying the statute at the time of its enactment, one of the reasons for codifying the definition of sodomy was to expand the crime to encompass "the action per os." Senate Report, *supra,* at 1717.

**39.** In this case, the trial court's instruction to the jury on the offense of sodomy provided:

In the law, sodomy is the commission of an unnatural sexual act with another person or with an animal. Specifically, the allegations in this case are that the defendant performed

the act of cunnilingus on the complainant [W.D.]. Cunnilingus is the act of placing the mouth on the female sexual organ and the touching of the sexual organs with the lips and/or the tongue.

You must determine in this case whether the Government has proved beyond a reasonable doubt that the defendant placed his mouth or tongue on or in the sexual organ of the complainant or that he put the sexual organ of the complainant on or in his own mouth, and second, that he intended to do that act.

**40.** Even if penetration were a requirement, the evidence presented here might very well have supported an inference of penetration. *See supra* note 5.

**41.** Under the common law, penetration of the anus by the penis was required to prove sodomy among human beings. *See Canter v. State,* 224 Md. 483, 484–85, 168 A.2d 384, 384 (1961) (per curiam); *State v. Pettijohn,* 541 S.W.2d 74, 76–77, 77 n. 1 (Mo.Ct.App.1976); 81 C.J.S. *Sodomy* § 6, at 654 (1977).

**42.** Courts in some other jurisdictions have held that oral contact with any part of a woman's genitalia without penetration by the tongue constitutes a violation of prohibitions against cunnilingus. *See Parris v. State,* 43 Ala.App. 351, 353, 190 So.2d 564, 565 (1966) (defendant "placed his mouth upon the sex organ" of complainant); *People v. Hunter,* 158 Cal.App.2d 500, 505, 322 P.2d 942, 945 (Dist.Ct.App.1958) ("[a] person is guilty of violating the [sodomy] statute when he has placed his mouth upon the genital organ of another"); *Gilmore v. People,* 171 Colo.

constitutes a violation of the sodomy statute, and considering the realities of female anatomy, can we agree that the phrase "taking into" in section 3502(a) requires entry into the mouth by the female sexual organ. As the North Carolina Supreme Court noted in a similar context, "[t]o adopt this view would saddle the criminal law with hypertechnical distinctions." *State v. Ludlum, supra* note 42, 303 N.C. at 672, 281 S.E.2d at 162. On the facts of this case, the sodomy instruction here was sufficient.[43]

## V

■ Appellant's other contentions warrant little discussion. First, the trial court did not err in granting the government's motion *in limine* to preclude appellant from impeaching the complainant's credibility by inquiring into her activities as a prostitute. Because the complainant had no convictions or adjudications of delinquency for prostitution, she could not be impeached under D.C.Code § 14–305 (1989), which permits impeachment with evidence of misdemeanors involving dishonesty. *Cf. Brown v. United States*, 518 A.2d 446, 447 (D.C.1986) (per curiam) (ruling that "soliciting for prostitution is an impeachable conviction"). Sexual activity not resulting in a felony conviction is not relevant for impeachment of general credibility. *McLean, supra* note 10, 377 A.2d at 78. This rule ordinarily applies even where the prior sexual activity includes prostitution. *Cf. Brewer, supra* note 21, 559 A.2d at 321 (evidence in rape case of complainant's prior prostitution activities not relevant on issue of consent and inadmissible).

■ Second, the trial court did not abuse its discretion in refusing to grant a mistrial after the prosecutor, in his rebuttal argument, directed the jury's attention to the absence of any evidence that the complaining witness had been convicted of a prostitution charge. The remark, though literally true, invited the jury to infer something that was false—*i.e.*, that the complaining witness was not a prostitute. Nevertheless, even if the prosecutor's remarks amounted to misconduct, the misconduct was not grave. Additionally, the trial court gave the jury a corrective instruction. We therefore conclude that appellant did not suffer "substantial prejudice" as a result of the prosecutor's argument. *Dyson v. United States*, 450 A.2d 432, 437 (D.C. 1982). As such, the refusal to grant a mistrial was not an abuse of discretion. *Beale v. United States*, 465 A.2d 796, 799 (D.C.1983), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984).

*Affirmed.*

SCHWELB, Associate Judge, concurring in part and dissenting in part:

With due respect for Judge Steadman's erudite opinion for the court, I am unable to join my colleagues' disposition of this appeal. In my opinion, Roundtree did not receive a fair trial on the sodomy charge. I so conclude for two reasons. First, in spite of persuasive evidence that the complaining witness, W.D., fabricated claims of sexual abuse in the past, the trial judge precluded cross-examination of her with regard to these prior accusations. Second, the judge excluded, as "irrelevant," proposed medical evidence about the existence of a "cheesy white extrudance" in the area of W.D.'s genitals which allegedly resulted

---

358, 360, 467 P.2d 828, 828 (1970) ("placing ... mouth on the vagina" of victim); *Carter v. State*, 122 Ga.App. 21, 23, 176 S.E.2d 238, 240 (1970) ("all that is required [to prove cunnilingus] is *some contact*" (emphasis in original)); *State v. Thompson*, 574 S.W.2d 432, 434 (Mo.Ct.App. 1977) ("any contact between the mouth or its component parts and the vulva is sufficient to constitute the offense of cunnilingus"); *State v. Ludlum*, 303 N.C. 666, 672, 281 S.E.2d 159, 162 (1981) ("stimulation by the tongue or lips of any part of a woman's genitalia" constitutes cunnilingus); *State v. McParlin*, 422 A.2d 742, 745 n. 6

(R.I.1980) (evidence of "oral-genital contact alone, without penetration," is sufficient to establish cunnilingus).

43. Appellant's related argument that the sodomy statute fails to give notice that it encompasses cunnilingus does not merit relief. *Cf. Rose v. Locke, supra* note 38, 423 U.S. 48, 96 S.Ct. 243 (per curiam) (ruling that statute prohibiting "crime against nature" gave adequate warning that cunnilingus was a prohibited act). This is particularly true in light of the language in our *Cozart* opinion.

from her affliction with a venereal disease, and which, a jury might well conclude, tended to make it substantially less likely that Roundtree engaged in cunnilingus with her.[1]

The potential impact on a reasonable jury of the excluded cross-examination and evidence was substantial. Moreover, Roundtree's first trial ended in a mistrial because the jurors were unable to agree on a verdict. I am therefore satisfied that Roundtree suffered substantial prejudice, and that the errors were not harmless. Accordingly, I respectfully dissent from the affirmance of Roundtree's sodomy conviction.[2]

I

## W.D.'s PRIOR ALLEGATIONS

*A. The evidence of fabrication—the Minnesota records and the professional and other evaluations of W.D.'s veracity.*

W.D. instituted a suit for damages against Roundtree and the District of Columbia in connection with the incident which precipitated this prosecution. During discovery in the civil action, the defendants obtained records from juvenile authorities in Minnesota, as well as testimony from W.D., which reflected the young woman's troubled life. My colleagues have summarized the contents of these records, maj. op. at 318–319, but the same facts come across a little differently to me. In my view, the information from Minnesota, together with W.D.'s admitted prevarications after she arrived in Washington, provide, at least, a *bona fide* and reasonable

basis to believe that some of her prior charges of sexual abuse were fabricated.

When W.D. was thirteen, the director of an institution for girls in that state described her as "one of the most severe victims of chronic emotional and physical neglect that I have ever encountered." She was apparently a victim of incest at 12, pregnant at 13, a mother at 14, and a prostitute at 15 or 16. With an I.Q. of 68 and second to fourth grade skills, W.D. had been exposed to marijuana, cocaine, pimps and a sordid lifestyle by her middle teens. Such an existence takes its toll. We would surely be blind to reality if we were to pretend that one who has endured so much can escape without potential erosion not only of her trust in authority but also of her credibility.

The records from Minnesota show that W.D. had claimed to have been the victim of rape or incest or sexual abuse by a substantial number of different men, including, at least,[3] the following:

1. W.D.'s half-brother Hank, who allegedly had sex with her on a weekly basis from the time that she was twelve;

2. her brother Joe (no elaboration provided);

3. a nephew, aged 23 or 24, whom W.D. refused to identify;

4. a boyfriend of her mother;

5. a boyfriend of her sister;

6. a counsellor at Juvenile Horizons, an institution in Minnesota for mothers in their teens;

7. a pimp named Casper;

8. Vernon, also a pimp, who was a boyfriend or former boyfriend of her sister;[4] and

---

1. I also find it to be patently unfair that Roundtree was sentenced to imprisonment for three to nine years because the judge obviously believed that he had committed *forcible* sodomy, when the jury had been instructed that the prosecution was required to prove only the elements of *consensual* oral sex—an activity in which the overwhelming majority of adults at least sometimes engage. *See* page 346, *infra.*

2. For reasons described at pages 346–347, *infra,* I join the majority in affirming Roundtree's conviction for tampering with evidence.

3. A few of the documents from Minnesota were so poorly reproduced that it is hard to read them. For obvious reasons, I enumerate only those incidents as to which the documentation is sufficiently legible.

4. This was apparently a different man from the one in item 5; one incident allegedly occurred in 1983 and the other two years later.

9. Six pimps who had gang-raped W.D. and her sister.[5]

Although some of W.D.'s claimed experiences, especially those with pimps, may well go with the lifestyle, the records on their face provide substantial reason to question the veracity of some of her allegations.[6] With respect to her half-brother Hank, W.D. alleged at different times that he had sex with her (1) weekly since she was twelve; (2) a total of four or five times; and (3) never.

W.D.'s allegations that a 22–year old counsellor at Juvenile Horizons had inappropriately stroked her "butt" was particularly suspect. It was investigated by the police and by the Juvenile Horizons authorities, and a comprehensive report was prepared by the latter. The counsellor had come to Juvenile Horizons with excellent references, and had worked with young women before. The writer of the report interviewed two psychiatrists, a psychologist, the program director, the staff supervisor, and three separate social workers, including the one primarily assigned to work with W.D.

Without exception, these individuals doubted W.D.'s veracity, largely because, as those who had worked with her unanimously agreed, she had a history of making false allegations in the past. Dr. Madamala, a staff psychiatrist at a Child Guidance Clinic, reported that "W.D. is a very angry child who has lied to the J.H. staff several times in the past." Ms. Pruden, the program director, related that W.D. "had lied to the staff in the past and was probably lying in the report about child abuse." Ms. Arenson, W.D.'s primary social worker, stated that "in the past [W.D.] had lied and exaggerated stories in order to get attention." Ms. Dawkins, another social worker, related that W.D. "has a history of making up stories," and that "it is her style to make up accusations as a power play." Mr. Lord, the staff supervisor, stated that he took W.D.'s accusations with "a grain of salt because of past questionable allegations" by her, and that he believed the accused counsellor's denials. Dr. Reed, who conducted a psychological evaluation of W.D., found that she was able "to scare and intimidate people with her hostile physical and verbal aggression," and concluded that W.D.'s "objective and reality testing is very tenuous and at least moderately impaired." Dr. Arnold, who also examined W.D., reported on her "exaggeration of symptoms, lack of cooperation, rebelliousness and anti-authority feelings." Dr. Gendron of the Fairview Hospital Adolescent Treatment Program stated that W.D. had a history of "aggressivity and blaming." One psychiatrist reported that W.D. had an "impaired" sense of reality.

Unsurprisingly, in light of the foregoing assessments of W.D., the complaint was closed as "unable to substantiate," or "unsubstantiated." The treatment team found reason to "suspect" that the incident "may have" occurred, but deemed the evidence insufficient in the absence of corroboration.[7]

The most recent of W.D.'s complaints in Minnesota was made in March of 1985; she reported that a pimp had forced her to have sex and to "work the streets" as a prostitute.[8] According to her deposition testimony in her civil suit, W.D. then travelled with a pimp in a brown Cadillac to Detroit, Chicago, New York and Washington, working as a prostitute in all of these cities.[9] In

5. W.D. testified that she had not reported the gang rape to the police but could not remember why.

6. According to my colleagues, maj. op. at 6, the presence of semen in W.D.'s pubic area provided partial corroboration of some of her allegations. Since W.D. concededly worked as a prostitute, and since there was no evidence of bruises or other injuries, the semen was hardly compelling corroboration.

7. I am constrained to wonder whether the jurors in the present case would have convicted Roundtree if they had known all the things about W.D. which were brought to the attention of the Juvenile Horizons authorities.

8. In response to a question by the police, W.D. reported that she had previously worked as a prostitute three times because she had been forced to do so by gangsters.

9. The transcript of the deposition is not in the record. W.D.'s deposition testimony was described both by the prosecutor and the defense attorney outside the presence of the jury in the

May 1985, she was arrested in Washington on a charge of soliciting for prostitution. She gave the police a false name [10] and lied about her age.[11] She was being held at the District of Columbia jail following this arrest at the time of her encounter with Roundtree.

### B. Judge Bacon's Ruling.

The government moved in *limine* prior to Roundtree's first trial for an order precluding any inquiry by the defense into W.D.'s prior allegations of sexual abuse. After having inspected the materials,[12] and before any *voir dire* was held, Judge Bacon stated that

> unless there is additional evidence about any of these matters ... they would not constitute evidence of bias.

> \*    \*    \*    \*    \*    \*

> My view is that at this time there is no basis for inquiry into prior accusations.

Conscientiously protecting his record, the prosecutor suggested that a proposed *voir dire* of W.D., which was to be conducted in order to determine her competency, be expanded to include her prior allegations of sexual abuse, "although I can proffer to the court based on my prior discussions that the court is on the money." The judge followed the prosecutor's suggestion and reserved ruling.

The ensuing *voir dire* was conducted exclusively by the judge outside the presence of the jury. During the course of her testimony, W.D. tearfully repeated her allegation that she had been sexually abused by her brother Hank. She explained that

she had later denied the truth of the charge because she did not want the police to be involved with her mother. She related that she did not report to the police abuse by her mother's friend because "my mom was going through a lot of problems and I didn't feel that she would trust me or believe me." She confirmed that she had made complaints about the counsellor at Juvenile Horizons and about assaults by pimps.

At the conclusion of the hearing, the judge granted the motion in *limine* because

> there is no substantial basis for concluding that these assaults are fabrication ... To permit inquiry into these prior incidents, I believe, would be matters that are precluded by *McLean* [13] and *Sherer* [14] and that the *voir dire* does not provide a basis for exceptions to *McLean* or *Sherer.*

The judge followed up her oral decision with a brief written order in which she emphasized that W.D.'s various complaints had not been "convincingly" shown to be false and that W.D.'s failure to prosecute incidents of sexual abuse did not establish their falsity. She cited *Sherer, supra,* 470 A.2d at 739, and *Hughes v. Raines,* 641 F.2d 790, 792 (9th Cir.1981), on which the court in *Sherer* had relied.

### C. The Restriction On Cross-Examination.

#### (1) Historical perspective—a legacy of injustice.

The question whether the trial court properly precluded Roundtree from inquir-

---

> proceedings before Judge Bacon, and those descriptions, which are consistent with each other, are the source of our information.

**10.** W.D. testified that she gave a false name because she did not want charges against her filed under her real name.

**11.** W.D. testified that she lied about her age because she had been told that she could get out of jail more easily as an adult.

**12.** The judge summarized the materials as follows:

> [It] appeared to me that there were miscellaneous references to two family members, a

brother and a friend of the mother's. There is a reference to a sister's friend and a reference to attacks by some pimps and a reference to abduction, in addition to the more fully documented Juvenile Horizons event.

As noted at pages 332–333, *supra,* the Minnesota materials contained a good deal more, especially in regard to W.D.'s credibility as perceived by professional people who had worked with her.

**13.** *McLean v. United States,* 377 A.2d 74 (D.C. 1977).

**14.** *Sherer v. United States,* 470 A.2d 732 (D.C. 1983), *cert. denied,* 469 U.S. 931, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984).

ing into W.D.'s prior allegations is a sensitive one. For many centuries, under a legal tradition established by men, *Commonwealth v. Bohannon*, 376 Mass. 90, 94–95, 378 N.E.2d 987, 991 (1978), female victims of rape and sexual abuse were treated harshly and unfairly pursuant to a pervasive double standard of sexual morality. *See* Chamallas, *Consent, Equality, and the Legal Control of Sexual Conduct*, 61 S.CAL.L.REV. 777, 788–89 (1988). In a revealing passage in the Bible, rape was treated as an offense against an unmarried woman's father rather than against her; the rapist's punishment, besides having to pay fifty shekels to the "owner," was a forced marriage to the victim. *Deuteronomy* 22:28–29. The raped woman was obviously given no choice about becoming the perpetrator's wife. *See also* Gold & Wyatt, *The Rape System: Old Roles and New Times*, 27 CATH.U.L.REV. 695, 696–700 (1978). Some two millenia later, Sigmund Freud, the father of psychoanalysis, still viewed the "exclusive right of possession of a woman" as the "essence of monogamy," and the "demand that the girl shall bring with her into marriage with one man no memory of sexual relations with another" as a "logical consequence" of that right.[15] The notion that the world is divided into "bad girls", who do, and "good girls", who don't, was part of a climate of "romantic paternalism" which put women, in Justice Brennan's apt phrase, "not on a pedestal, but in a cage." *Frontiero v. Richardson*, 411 U.S. 677, 684, 93 S.Ct. 1764, 1769, 36 L.Ed.2d 583 (1973) (plurality opinion).[16] Nowhere was this cage more confining and oppressive to women than in relation to the law of sexual crimes.

Until quite recently, the complaining witness in a sexual assault case was presumed to be so lacking in credibility that special rules of corroboration, unheard of in relation to other crimes, were deemed to be necessary and appropriate. *See Arnold v. United States*, 358 A.2d 335, 344 (D.C. 1976) (*en banc*). A defendant charged with a sexual offense could effectively put his victim on trial, for her entire sexual history and reputation were deemed "fair game" in relation to the issue of consent.[17] The most private facts in a woman's life were thus exposed to the world for all, and especially those of prurient orientation, to see, denounce and deride. Despite their perceived "natural ... timidity and delicacy" *Bradwell v. Illinois*, 83 U.S. (16 Wall) 130, 141, 21 L.Ed. 442 (1872), women alleging rape were required to put up the "utmost resistance" to their assailants before a guilty verdict would be sustained. Estrich, *supra*, note 15, 95 YALE L.J. at 1122 n. 105. In one notorious case involving the rape of a sixteen year old virgin, the victim's repeated struggles and screams while the attacker almost choked her, even when coupled with her attempts to escape, were viewed as woefully insufficient in comparison with "the terrific resistance which the determined woman should make." *See Brown v. State*, 127 Wis. 193, 201, 106 N.W. 536, 539 (1906). Moreover, even if a woman did resist vigorously, this was often treated as evidence that she derived erotic pleasure from being overcome.[18]

---

**15.** 4 S. FREUD, COLLECTED PAPERS 217 (Riviere trans. 1925), *quoted in* S. Estrich, *Rape*, 95 YALE L.J. 1087, 1141 n. 170 (1986) (hereinafter Estrich).

**16.** *See, e.g.*, the concurring opinion of Justice Bradley in *Bradwell v. Illinois*, 83 U.S. (16 Wall) 130, 141, 21 L.Ed. 442 (1872), in which the Court sustained a prohibition against the practice of law by women:

The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life ... The paramount destiny and mission of woman are to fulfill the noble and benign offices of wife and mother. This is the law of the Creator.

**17.** *See, e.g., Packineau v. United States*, 202 F.2d 681, 685–87 (8th Cir.1953) (error to exclude evidence of complaining witness' "concupiscence— of her having sexual lust and unlawfully indulging in it" with other men); *People v. Abbot*, 19 Wend. 192, 195 (N.Y.Sup.Ct.1838) ("will you not more readily infer assent in the practiced Messalina, in loose attire, than in the reserved and virtuous Lucretia?"); Estrich, *supra*, 95 YALE L.J. at 1130–32.

**18.** "Although a woman may desire sexual intercourse, it is customary for her to say "no, no, no" (although meaning "yes, yes, yes") and to expect the male to be the aggressor." Slovenko, *A Panoramic Overview: Sexual Behavior and the Law* in SEXUAL BEHAVIOR AND THE LAW 5 (Slo-

That only a small percentage of cases of rape and sexual abuse were reported, and that fewer still resulted in conviction, is hardly surprising in light of the applicable "rules of the game," only some of which are described above.[19] In reaction to these palpable injustices, the courts of this jurisdiction, like others elsewhere, took a number of measures to redress the balance. The requirement that the victim prove actual physical resistance in order to negate consent has largely been relegated to the ash-heap of history. *See* Chamallas, *supra*, 61 S.Cal.L.Rev. at 799. The corroboration requirement as to mature females was abolished here in 1976. *Arnold, supra*, 358 A.2d at 344, *see also Gary v. United States*, 499 A.2d 815, 832–33 (D.C. 1985) (*en banc*) (child complainants), *cert. denied*, 477 U.S. 906, 106 S.Ct. 3279, 91 L.Ed.2d 568 (1986), and 475 U.S. 1086, 106 S.Ct. 1470, 89 L.Ed.2d 725 (1986). In 1977, this court held in *McLean* that inquiry into a woman's prior sexual conduct and her reputation for "unchastity" is presumptively impermissible and will be countenanced only in the unusual case in which the probative value of such evidence demonstrably outweighs its prejudicial effect. 377 A.2d at 77–80. *See also Brewer v. United States*, 559 A.2d 317, 320–22 (D.C.1989); *cf. State ex rel. Pope v. Superior Court*, 113 Ariz. 22, 24–29, 545 P.2d 946, 948–53 (1976) (*en banc*). The trial judge in this case may have viewed a proscription against inquiries into W.D.'s prior complaints of sexual abuse as another step in this progression from injustice to equity.

But the end does not justify the means. Our commitment to eradicating past and present[20] wrongs may not be permitted to dilute our determination that all defendants, including those charged with sexual offenses, receive the fair trial which is their constitutional due. Under the Sixth Amendment, the accused has the right to confront the witnesses against him. A primary interest secured by the confrontation clause is the right of cross-examination, so that the finder of fact has an adequate opportunity to assess the credibility of prosecution witnesses. *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *see also Berger v. California*, 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969) (*per curiam*). Where the individual whom the accused seeks to cross-examine is, as in the present instance, a "star" witness essential to the prosecution case, the importance of full cross-examination to disclose possible bias is necessarily enhanced. *Lawrence v. United States*, 482 A.2d 374, 377 (D.C. 1984); *United States v. Summers*, 598 F.2d 450, 460 (5th Cir.1979). As the Supreme Court of New Hampshire, speaking through Judge (now Justice-designate) David Souter, has recognized with reference to a rape shield law, "such a statute's reach has to be limited by a defendant's . . . rights to confront the witnesses against him and to present his own exculpatory evidence." *State v. Colbath*, 130 N.H. 316, 323, 540 A.2d 1212, 1216 (1988); *see also Winfield v. Commonwealth*, 225 Va. 211, 217–18, 301 S.E.2d 15, 19 (1983). In the present case, there is no statute actually or ostensibly proscribing cross-examination of W.D. as to her past complaints, and the intrusion into W.D.'s privacy potentially generated by such cross-examination is far less grave than that which would be occasioned by an inquiry into her past sexual experiences.[21]

venko ed. 1965), quoted in Note, *The Resistance Standard in Rape Legislation*, 18 Stan.L.Rev 680, 682 (1966).

**19.** *See also* Gold & Wyatt, *supra*, 27 Cath U.L. Rev. at 706–714, vividly describing the treatment dispensed to rape victims at the hospital, at the police station, and in the prosecutor's office.

**20.** In the most recent edition of his treatise, Professor Wigmore remarks that

the unchaste . . . mentality finds incidental but direct expression in the narration of imaginary sex incidents of which the narrator is the heroine or the victim. On the surface the narration is straightforward and convincing. 3A J. Wigmore, Evidence § 924(a) (Chadbourn rev. ed. 1970). Accordingly, he proposes that no sexual assault case go to the jury unless a psychiatric examination has been performed and the examining physician has testified with respect to the complainant's mental health. *Id.*

**21.** Moreover, W.D. had instituted civil litigation prior to the trial of this case, and the information from Minnesota was already in the hands

For reasons discussed below, *see* pages 337–341, *infra*, the degree to which cross-examination as to other allegations must be permitted depends on a variety of circumstances. An inappropriate restriction of such examination is not necessarily a violation of the confrontation clause, and I would not constitutionalize my objections to the trial court's procedures in this case. Nevertheless, the right to confrontation is in some measure implicated here, *see Davis v. Alaska, supra,* and courts must bear constitutional considerations in mind.

### (2) *Impeachment of W.D. with her prior accusations.*

With some necessary accommodation of the rights of complainants in sexual offense cases, the issue here under discussion falls within the general rubric of the claim-minded plaintiff, typified by the shepherd boy who cried "Wolf!" once too often. As Professor McCormick has correctly noted, the courts of the District of Columbia are notably liberal in receiving evidence of claim-mindedness and allowing the jury to assess its weight. E. CLEARY, MCCORMICK ON EVIDENCE § 196, at 580 n. 10 (3d ed. 1984) (hereinafter MCCORMICK).

The leading case in this jurisdiction is *Mintz v. Premier Cab Association, Inc.,* 75 U.S.App.D.C. 389, 127 F.2d 744 (1942), a personal injury action in which the court sustained the trial court's decision to permit the cross-examination of the plaintiff with regard to two prior claims:

> Fortuitous events of a given sort are less likely to happen repeatedly than once. The fact that a witness has told several stories involving similar fortuitous events tends, therefore, to create a conflict between his testimony and normal experience. So it has been held that one who furnishes an alibi for a criminal defendant may be asked whether he has furnished other alibis for the same defen-

dant; one who accuses a man of robbing him while he was drunk may be asked whether he has made the same charge against other men; *the prosecuting witness in a rape case may be asked whether she has made similar charges against other men . . . .* This type of evidence, like many other types, may create prejudice but is believed to be worth more than it costs.

\* \* \* \* \* \*

*That all three of appellant's stories may have been true affects the weight of the evidence, not its admissibility.* It was for the jury to decide from all the evidence, and from its observation of appellant on the stand, whether she was merely unlucky or was "claim-minded." *Id.* at 389–90, 127 F.2d at 744–45 (emphasis added and footnote omitted). *Accord, Manes v. Dowling,* 375 A.2d 221, 223 (D.C. 1977); *Evans v. Greyhound Corp.,* 200 A.2d 194, 196 (D.C.1964).

Under the *Mintz* analysis, the party seeking to cross-examine the complaining witness about other complaints need not first prove their falsity. The principle that lightning does not usually strike the same person twice (or four times or nine times) is deemed sufficiently persuasive to warrant leaving it to the jury to assess the significance of past complaints. The courts of this jurisdiction avoid what Judge Posner has called "crabbed notions of relevance or excessive mistrust of juries," *Riordan v. Kempiners,* 831 F.2d 690, 698 (7th Cir. 1987), and decline to keep from properly instructed jurors the kinds of information which, as a matter of common sense and human experience, might well affect their rational assessment of the situation.

Although plainly *obiter dictum,* the allusion in the *Mintz* opinion to a rape complainant is broad enough, for all practical purposes, to reach the present case.[22] The

---

of the District. The impact which the proposed cross-examination might otherwise have had on W.D.'s privacy has therefore been significantly attenuated.

**22.** I agree with the majority that Judge Edgerton's italicized language regarding rape victims was not necessary for the decision in the case,

and I acknowledge that the legal climate has changed in the past forty-eight years in regard to sexual assault cases. I therefore would not follow the *Mintz* dictum if there were no evidence at all that the prior accusation was false. As I point out at pages 339–340, however, changes such as the enactment of rape-shield

frequency with which a woman or girl has alleged that various men have sexually assaulted her was considered to be something the jury should know in deciding whether to believe her. Neither before *Mintz* nor in the forty-seven years since that decision has this court squarely confronted the issue in a case in which the defendant sought to cross-examine the alleged victim of a sexual assault about prior charges against other men. Although the trial judge relied primarily on *Sherer*, discussed in some detail at page 340, below, the closest case to the present one is *Lawrence*.

*Lawrence* was charged with taking indecent liberties with a six-year-old girl. One of the witnesses against him was Darlene Mayo, the child's aunt. Lawrence sought to cross-examine Ms. Mayo about what he claimed were prior false allegations by her of other incidents of sexual abuse in the family. The trial judge, without conducting a *voir dire* examination as to the truth or falsity of Ms. Mayo's other charges, refused to permit the inquiry. Lawrence was found guilty, but this court reversed his conviction. Emphasizing that the confrontation clause was implicated and that the defendant's right to challenge the credibility of prosecution witnesses was protected by that clause, the court said:

> An examination of the record reflects a curtailment of an appropriate line of cross-examination which prevented the jury from receiving information essential to an assessment of Darlene Mayo's credibility as a government witness. Appellant sought to confront Darlene Mayo with the fact that she had accused Michael Mayo in April 1981 of having intercourse with her five-year-old daughter and with the fact that she had accused Jacqueline in July 1981 of having intercourse with their elderly uncle. The trial court refused to allow this line of inquiry. Regardless of her response, the jury could have assessed Mayo's truth-

fulness and veracity by defense counsel's probe of this sensitive area and have viewed her testimony with greater skepticism. The trial court's action may have kept from the jury relevant and important facts bearing on the trustworthiness of crucial testimony [of] a key witness [whose] testimony establishes a required element of the charged offense [and] has little independent corroboration.

482 A.2d at 377 (internal quotation marks and alteration marks omitted). The court also stated that the trial court's error in this curtailment of cross-examination was rendered "more severe" because Ms. Mayo was a "key" prosecution witness. *Id.*

*Lawrence* is distinguishable from the present case in two respects. First, the trial judge made no attempt, outside the presence of the jury, to assess the truth or falsity of Ms. Mayo's other charges. Second, the case did not involve other complaints by the alleged victim of the crime, so that the protection of complaining witnesses from intrusion into private facts is not directly implicated.[23] The decision is important for present purposes, however, because this court did not ground its ruling on the trial judge's failure to conduct a *voir dire* examination. Rather the court held that cross-examination of a key witness about her other accusations was critical to the jury's opportunity to assess her credibility, and this proposition was not conditioned on any previous finding that the other allegations were false.

Courts in other jurisdictions have approached the issue here presented in a variety of ways. *See generally* Annot., *Impeachment or Cross–Examination of Prosecuting Witness in Sexual Offense Trial by Showing That Similar Charges Were Made Against Other Persons*, 71 A.L.R.4th 469 (1989). Some have been quite liberal in permitting such examina-

---

statutes and similar developments, do not require the exclusion of evidence of "claim-mindedness" on the part of W.D., and I disagree with the majority's apparent view (albeit one couched in more circumspect language) that *Mintz* is an obsolete relic from which we can

learn nothing except that our predecessor judges lacked enlightenment.

**23.** The proposed cross-examination would, however, have made public embarrassing allegations about members of the family and their sexual practices.

tion.[24] Others have required the defendant, before being permitted to cross-examine the complaining witness as to charges which she had made against others, to show, outside the presence of the jury, that the other complaints have been proved or conceded to be false.[25]

In my opinion, the most persuasive approach is the intermediate one taken by those courts which require the defendant to demonstrate that there is a reasonable *bona fide* basis for the proposed line of interrogation. *See, e.g., Woods v. State,* 657 P.2d 180, 182 (Okla.Cr.App.1983); *State v. LeClair,* 83 Or.App. 121, 126–32, 730 P.2d 609, 613–16 (1986), *review denied,* 303 Or. 74, 734 P.2d 354 (1987); *Commonwealth v. Bohannon, supra,* 376 Mass. at 94–95, 378 N.E.2d at 991. In *LeClair,* the court indicated that, under the confrontation clause, such cross-examination must be permitted, *inter alia,* where there is some evidence that the complaining witness has made prior false accusations, unless the probative value of the evidence is substantially outweighed by its prejudicial effect. 83 Or.App. at 129, 730 P.2d at 615. In *Bohannon,* the Supreme Judicial Court of Massachusetts, applying a similar test, stated that leave of court to cross-examine as to other charges should be obtained in advance, and held that such cross-examination should have been permitted where

> the defendant made an offer of proof which indicated that he had a factual basis from independent third party records for concluding that prior allegations of rape had, in fact, been made and were, in fact, untrue.

376 Mass. at 95, 378 N.E.2d at 991. These decisions, in my view, provide the defendant with a reasonable opportunity for cross-examination, but are also appropriately sensitive to the interests of the complaining witness.

### (3) *The trial judge's ruling: McLean and Sherer examined.*

There is no indication that the trial judge considered *Mintz, Lawrence,* or any cases from other jurisdictions [26] when she prohibited the proposed cross-examination. As noted above, she evidently believed that the issue was controlled by *McLean, Sherer,* and *Hughes.* I cannot agree.

*McLean,* which presumptively proscribes examination of the complaining witness about her sexual history and reputation, does not deal at all with allegations by a complainant that she has previously been the victim of one or more sexual assaults. As the court noted in *Bohannon,*

> the proposed questions dealt with prior *allegations* of rape; they in no way sought to elicit a response concerning the complainant's prior sexual activity or reputation for chastity. We, therefore do not reach any issues related to the recently enacted "rape-shield" statute.

376 Mass. at 95, 378 N.E.2d at 991 (emphasis added). *Accord, West v. State,* 290 Ark. 329, 330–34, 719 S.W.2d 684, 686–87 (1986); *Covington, supra,* 703 P.2d at 442; *State v. Johnson,* 66 N.C.App. 444, 446–47, 311 S.E.2d 50, 52, *review denied,* 310 N.C. 747, 315 S.E.2d 707 (1984); *Woods, supra,* 657 P.2d at 182 n. 1; *But see United States v. Cardinal,* 782 F.2d 34, 36 (6th Cir.), *cert. denied,* 476 U.S. 1161, 106 S.Ct. 2282, 90 L.Ed.2d 724 (1986); *Carter v. State,* 451 N.E.2d 639, 644–45 (Ind.1983). *McLean* stands for the proposition that consent may not be inferred from a woman's sexual activities with others; in the present case, the question of consent does not arise.

*Sherer* was not a sexual assault case at all. The defendant was charged with first

---

24. *See, e.g., State v. Chambers,* 370 N.W.2d 600, 602 (Iowa Ct.App.1985) (non-sexual assault case; "[w]hile being a habitual victim doesn't necessarily reflect on that witness' credibility, the jury is entitled to know that fact and to assess it in relation to the other evidence presented"); *State v. Durham,* 74 N.C.App. 159, 162–69, 327 S.E.2d 920, 923–27 (1985); *State v. Ouellette,* 190 Conn. 84, 102–04, 459 A.2d 1005, 1015 (1983).

25. *See, e.g., Covington v. State,* 703 P.2d 436, 442 (Alaska Ct.App.), *modified on other grounds on rehearing,* 711 P.2d 1183 (Alaska Ct.App.1985); *State v. Kringstad,* 353 N.W.2d 302, 311 (N.D. 1984).

26. Except *Hughes.*

degree murder while armed, and with several other offenses. A key prosecution witness was Garrison, Sherer's alleged accomplice. In a pretrial motion *in limine*, Sherer sought leave to examine Garrison about perjury which Garrison had allegedly committed in an earlier trial in Virginia. The government denied that Garrison had lied at that trial, contending among other things that he had passed two polygraph tests. The trial judge denied Sherer leave to conduct the proposed examination. This court affirmed, adopting as its own, 482 A.2d at 377, the following language from *Hughes, supra,* 641 F.2d at 792, a rape case in which the defendant had sought to cross-examine the complaining witness about a prior allegation of rape against another man:

> First, any conclusions drawn from this fact that would bear on this case would depend upon whether it could be shown convincingly that the other charge was false. This is very doubtful. The offer of proof indicates that cross-examination would have revealed that [the complainant] contended the prior charge was true, that the man involved denied attempting to rape her, and that the district attorney did not prosecute the charge. The fact that the district attorney chose not to prosecute, in itself, could mean no more than that he decided he did not have sufficient evidence to obtain a conviction.

I find the distinctions between this case on the one hand and *Sherer* and *Hughes* on the other compelling. In *Sherer,* as in *Hughes,* the prosecution witness had made one prior allegedly false charge. In each case, the witness apparently continued to stand behind his or her previous accusation. Neither allegation had been withdrawn. There was no independent evidence suggesting that the complaining witness was unreliable or had made false charges of this kind.

In the present case, on the other hand, W.D. had made allegations against approximately nine men. She had given three inconsistent versions of what occurred between her and her half-brother Hank. In connection with the charges against the counsellor at Juvenile Horizons, eight different professional people had indicated (with varying degrees of emphasis) that W.D. probably ought not to be believed. Several of them alluded to her having "made up" stories in the past. W.D. admitted lying to the police about her name and age upon her arrest in Washington. As in *Bohannon,* the information suggesting her unreliability came from records relating to the complaining witness which were furnished by an agency which had no connection whatever with the defendant.

It is true that the formulation in *Hughes,* quoted in *Sherer,* makes the present issue turn on "whether it could be shown *convincingly* that the other charge was false." I do not believe, however, that the result in this case can or should be controlled by that one italicized word. "It is well to remember that significance is given to broad and general statements of law only by comparing the facts from which they arise with those facts to which they supposedly apply." *Kraft v. Kraft,* 155 A.2d 910, 913 (D.C.1959). *Accord, Armour & Co. v. Wantock,* 323 U.S. 126, 132–133, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944) (words of opinions are to be read in light of facts under discussion; transposition to other facts is often misleading).

The court in *Sherer* was addressing a specific factual situation. I do not think that it was attempting to analyze the standards applicable to cases with facts such as these here presented. The numerous precedents, some of which are cited in this opinion, were neither cited nor discussed. Indeed, in *Lawrence,* decided a year after *Sherer* in an opinion in which *Sherer* was repeatedly cited, the court reached a result which could not be sustained if, in every case, the defendant must "convincingly" show the witness' prior allegations to be false before being permitted to cross-examine with respect to them. Accordingly, reading *Mintz, Sherer* and *Lawrence* together, I believe it to be in the interest of justice, and consistent with District of Columbia authority, to adopt the reasoning of *Bohannon, LeClair* and similar cases discussed at page 339, *supra.* Applying that standard here, I am satisfied that Roundtree had a *bona fide* reasonable basis for

believing that at least some of W.D.'s past allegations were false. Accordingly, he should have been permitted to question W.D. on the subject.

In summary, I would hold that the defendant must be allowed to cross-examine the complaining witness about prior claims of sexual assault as long as he has a *bona fide* reasonable basis for believing that any such claims may be untrue, unless the court specifically finds that the probative value of such an inquiry is substantially outweighed by its prejudicial effect. In assessing whether counsel has such a *bona fide* reasonable basis, the court should consider the number and nature of the claims, as well as any information counsel may have tending to cast doubt on the complainant's veracity. In considering prejudicial effect, the court should consider the need to avoid diversion of the trial to collateral inquiries as well as the danger, in particular cases, of inflaming the jury. *See generally State v. LeClair, supra,* 83 Or.App. at 129, 730 P.2d at 615 (court to consider prejudice, confusion, embarrassment or delay). The court should, however, also bear in mind the sound presumption that, in general, jurors will faithfully follow the judge's instructions. *Hairston v. United States,* 497 A.2d 1097, 1103 (D.C.1985).

(4) *Abuse of discretion or error of law.*

The government contends, and the majority holds, that the proper question for our review is whether the trial judge abused her discretion. It is not apparent to me that the judge was initially exercising discretion, or that she viewed herself as doing so. *See Johnson v. United States,* 398 A.2d 354, 363 (D.C.1979). Rather, she held that the proposed cross-examination was *precluded* by *Sherer* and *McLean.* Assuming, *arguendo,* that the judge was exercising discretion, *see* maj. op. at 324 n. 22, she did not purport to apply the test which

I believe to be the correct one, nor did she consider precedents, other than *Sherer,* which pointed to a result different from the one she reached.

A trial court abuses its discretion when it rests its conclusions on incorrect legal standards. *Jett v. Sunderman,* 840 F.2d 1487, 1496 (9th Cir.1988).[27] Exercise of judicial discretion must be founded upon correct legal principles. *See Conrad v. Medina,* 47 A.2d 562, 565 (D.C.1946). My view that the judge failed to apply the correct test—*i.e.,* whether the defendant had a *bona fide* and reasonable belief that W.D.'s prior allegations were false—compels me to conclude that she reached the wrong result; if you ask the wrong question, you are apt to receive the wrong answer. Accordingly, I would hold that the judge's refusal to allow cross-examination of W.D. with regard to her prior complaints constituted error of law.[28] Moreover, given the evidence from Minnesota, and especially the unfavorable professional and other assessments of W.D.'s veracity—assessments to which the trial judge apparently gave no consideration—I would conclude as a matter of law that any prejudice to the government or to W.D. from requiring her to respond to questions as to her past allegations against other men, without more, would not have "substantially outweighed" the probative value of the inquiry. *See Bohannon, supra,* 376 Mass. at 93–94, 378 N.E.2d at 990; *Mintz, supra,* 75 U.S.App.D.C. at 390, 127 F.2d at 745 (such evidence worth more than it costs).

## II

### THE EXCLUSION OF THE MEDICAL EVIDENCE

A. *Relevancy—Roundtree's motive or lack thereof.*

The defense proffered the testimony of a physician who had examined W.D. The

---

**27.** I note, in this regard, that defense counsel did not cite other precedents to her, and a trial judge often has little time to embark in mid-motion on ambitious research projects of this kind. It is for reasons like this that the term "abuse of discretion" sounds much worse than it really is and does not imply any reflection on the trial judge. *See King v. United States,* 550 A.2d 348, 353 n. 3 (D.C.1988).

**28.** Roundtree's counsel sought only to question W.D. about the prior incidents and proffered no extrinsic evidence about them. Accordingly, there was no appreciable danger that a series of mini-trials would result.

doctor was said to be prepared to testify that W.D. had contracted a venereal disease and that there was a "cheesy white extrudance" in her genital area. Counsel described the extrudance in his proffer as a "heavy discharge." He contended that it was incredible that Roundtree would have committed the crime under these circumstances.[29]

The prosecutor opposed admission of the evidence. He argued that, "in the light of the defense,"[30] the evidence was irrelevant, and that its admission would be prejudicial to W.D. and to the government. The judge found the evidence "irrelevant to any issue." She never reached the question of prejudice.

I think the proffer was plainly relevant to the issue of motive (or the lack thereof) and disincentive. The jury could reasonably find it less likely that Roundtree, whose "lustful" motivation[31] the government made substantial efforts to show,[32] would want to come into oral contact with a diseased genital area than with a healthy one. If such evidence made it less probable that Roundtree was motivated to commit the crime, it likewise made it less likely that W.D. was telling the truth when she testified that Roundtree committed it.

"Motive is evidence of the commission of any crime." *United States v. Bradshaw*, 690 F.2d 704, 708 (9th Cir.1982), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983). It is "a state of mind that is shown by proving the emotion that brings it into being." *United States v. Tierney*, 760 F.2d 382, 387 (1st Cir.), *cert. denied*, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). Relevancy objections to evidence relating to motive have long been disfavored. *Moore v. United States*,

150 U.S. 57, 60–61, 14 S.Ct. 26, 27–28, 37 L.Ed. 996 (1893); *Tierney, supra,* 760 F.2d at 387. "[I]n general, *any fact may be offered* which by possibility can be conceived as *tending with others towards the emotion* in question." 2 J. WIGMORE, supra, note 20 § 389, at 417 (emphasis in original). The opportunity for sexual gratification can obviously provide a motive for Roundtree's conduct.

But evidence about motive is a two-way street. "[T]he absence of motive tends to support the presumption of innocence; it is a fact to be reckoned [with] on the side of innocence." *People v. Weatherford*, 27 Cal.2d 401, 423, 164 P.2d 753, 765 (1945) (*en banc*). Any evidence which tends to shed light on the defendant's motive is admissible against him, but he may then, in turn, offer rebutting proof tending to negate motive. *State v. Rogers*, 19 N.J. 218, 228–29, 116 A.2d 37, 42 (1955); *State v. Vojacek*, 49 N.J.Super. 429, 433–34, 140 A.2d 228, 231 (1958). As the court explained in *Pollard v. State*, 218 Ind. 56, 60, 29 N.E.2d 956, 957 (1940),

> [t]he absence of a motive for committing the crime charged is in the nature of an exculpatory circumstance which a defendant on trial is entitled to establish ... To exclude such proof would place an arbitrary limitation on the accused that would be unjust, in view of the freedom allowed the prosecution in adducing facts and circumstances pointing to his guilt.

*Accord, People v. Kepford*, 52 Cal.App. 508, 510–11, 199 P. 64, 65 (1921); *People v. Cotto*, 28 A.D.2d 1116, 1117, 285 N.Y.S.2d 247, 249 (1st Dept.1967) (*per curiam*). In the present case, the cheesy extrudance tended to show more than a lack of motive to sodomize; a reasonable jury might conclude that it provided a powerful disincen-

---

**29.** I am constrained to agree with my colleagues, maj. op. at 327, that defense counsel might have presented this issue more precisely and more cogently. He did, however, raise it, and since the majority views the point, albeit somewhat gingerly, as having been adequately preserved, I will not further encumber this opinion with authorities on that subject.

**30.** The government's contention appears to be that, since Roundtree denied engaging in any sexual conduct with W.D., he would be unaware

of any infection, and "the proffered evidence of disease was not therefor probative of any substantive issue."

**31.** *See Speagle v. State,* 390 So.2d 990, 992–93 (Miss.1980).

**32.** Evidence of Roundtree's alleged propositioning of Officer Brock and of his telephone discussion with his weekend sexual partner was admitted to depict Roundtree's frame of mind.

tive to do so. If evidence of lack of motive is relevant, then evidence of disincentive is even more probative.

Concededly, we cannot know for sure whether Roundtree would have wished to have oral sex with W.D. even if she suffered from the affliction which the physician was said to be prepared to describe. As Justice Cardozo aptly observed for the court in *Lewis v. Ocean Accident & Guarantee Corp.*, 224 N.Y. 18, 22, 120 N.E. 56, 57 (1918), however, "the law contents itself with probabilities, and declines to wait for certainty before drawing its conclusions." Ordinarily, any evidence which is logically probative of some fact in issue is admissible, *Ahrens v. Broyhill*, 117 A.2d 452, 455–56 (D.C.1955), unless it conflicts with some settled exclusionary rule. *Fowel v. Wood*, 62 A.2d 636, 637 (D.C.1948). "[I]f the evidence conduces in any reasonable degree to establish the probability or improbability of a fact in controversy, it should go to the jury." *Home Insurance Co. v. Weide*, 78 U.S. (11 Wall.) 438, 440, 20 L.Ed. 197 (1871).

> It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable. Thus, the common objection that the inference' for which the fact is offered "does not necessarily follow" is untenable. It poses a standard of conclusiveness that very few single items of circumstantial evidence ever could meet. A brick is not a wall.

McCORMICK, *supra*, § 185, at 542–43 (footnotes omitted).

At trial, W.D.'s credibility was a critical issue. The doctor's evidence would have provided a reason—indeed, a jury exercising its common sense and experience might very well have found it a persuasive reason—to question whether Roundtree was likely to have been motivated to sodomize W.D. as she alleged. The existence of the disease might have appeared to the jury sufficiently likely to inhibit Roundtree from committing oral sodomy to create a reasonable doubt as to the truthfulness and plausibility of W.D.'s account. I cannot agree with the trial judge's conclusion that the evidence was irrelevant.

### B. Probative value, prejudice, and the trial court's responsibility.

In rhetoric which I do not find to be understated, the government contends that the proffered testimony

> would have been the rankest imaginable form of prejudicial character assassination with absolutely no countervailing probative value.

Accordingly, says the government, there was no abuse of discretion in excluding it.

As the foregoing recitation of the manner in which the issue was decided demonstrates, however, I can "find nothing in the record to show that the trial [judge] was exercising [her] discretion in excluding the testimony, and [I] therefore cannot [vote to] uphold the exclusion on those grounds." *State v. Dutremble*, 392 A.2d 42, 46 (Me. 1978); *see also Hrnjak v. Graymar, Inc.*, 4 Cal.3d 725, 732–33, 484 P.2d 599, 604–05, 94 Cal.Rptr. 623, 628–29 (1971) (*en banc*) (error to fail to weigh probative value against prejudicial impact).[33] Although the trial judge has wide latitude in balancing these factors, evidence should be excluded only if its probative value is *substantially* outweighed by the danger of unfair prejudice. McCORMICK, *supra*, § 185, at 545 (emphasis added). The judge made no such determination here, and the probative value of the evidence was substantial.[34] It should have been admitted.

---

**33.** The judge's mistaken belief that the evidence was irrelevant would have doomed her exercise of discretion even if she had attempted one, which she did not.

**34.** With due respect to my colleagues, I do not believe that the relevance of the evidence was "marginal." Maj. op. at 329. I suggest that a jury could reasonably find it much less likely, and not just marginally less likely, that a man would wish to have oral contact with a woman's pubic area if that area were diseased.

## III

## HARMLESS ERROR ANALYSIS

My colleagues discern no error in the trial judge's restriction of cross-examination and apparently hold that the exclusion of evidence regarding the appearance of W.D.'s diseased genitals, if incorrect, was harmless. In my opinion, both rulings were not only erroneous but manifestly prejudicial.

To warrant a holding that trial court error is harmless, the court must be satisfied "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Giles v. United States*, 432 A.2d 739, 746 (D.C.1981) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)); *see also* D.C.Code § 11–721(e) (1989). In discussing the "cheesy extrudance" issue, the majority acknowledges that

> [i]f, as appellant suggests, the symptoms of W.D.'s disease would have made oral sex unpleasant and therefore unlikely to occur, this evidence could be somewhat probative of the credibility of her account of the sodomy. As such, it might have made a jury somewhat more likely to believe appellant's version of events, *i.e.*, that no oral sexual contact occurred.

Maj. op. at 327. If this passage is stripped of the editorial use, twice, of the word "somewhat", it correctly states the problem confronting my colleagues' position. Had the condition and appearance of W.D.'s genital area been disclosed to the jurors, it would have been "more likely," to use the majority's expression, that they would have believed Roundtree and disbelieved W.D. with respect to whether or not oral sodomy occurred. Under these circumstances, I do not understand how the majority can state "with fair assurance," *Giles, supra,* 432 A.2d at 746, that the jury's verdict would not have been differ-

ent if the disputed evidence had been received.

My colleagues apparently affirm the judgment in spite of the trial judge's erroneous ruling because, in their view, the government's case would have supported a guilty verdict even if the proffered defense evidence had been admitted. But "[e]ven if an appellate court is without doubt that a defendant is guilty, there must be a reversal if the error is sufficiently serious." *United States v. Tussa,* 816 F.2d 58, 67 (2d Cir.1987). A finding that the evidence would have supported the conviction even if the judge had ruled correctly is not dispositive of the question of harmless error. *DeVine v. Solem,* 815 F.2d 1205, 1208 (8th Cir.1987); *Thompson v. Leeke,* 756 F.2d 314, 316 (4th Cir.1985). Accordingly, harmless error analysis "should not be limited to superficial inquiry as to whether the same verdict would have been possible absent the tainted evidence." [35] *Brooks v. United States,* 367 A.2d 1297, 1309 (D.C.1976).

If the evidence of the cheesy extrudance had been admitted, the context of this case would have been materially altered. There would have been an evidentiary predicate for defense counsel to attack W.D.'s credibility with a potentially persuasive argument to the jury grounded on common sense. The jurors might have thought that Roundtree would not have been likely to do what W.D. said he did. The record having been improperly constricted, and the relevant evidence having been excluded, defense counsel was in no position to make such an argument. When this court determines from its lofty appellate perch that the exclusion of this evidence did not affect the verdict,[36] it seems to me to be substituting its assessment for the only assessment that should really count—that of a jury which, unlike the trial jury in this case, has an opportunity to consider all of the relevant and admissible evidence. Basically, I think my colleagues are guessing as to what the jury would have decided if the

---

**35.** Or, here, absent the error in excluding probative evidence.

**36.** I agree with the majority that Roundtree's credibility had been significantly impaired by

the prosecutor's effective cross-examination. That Roundtree probably lied does not necessarily mean, however, that he had oral sex with W.D.

doctor had been allowed to testify about the appearance and condition of W.D.'s genitals. Roundtree's liberty should not depend on such a guess.

We must remember that if only a single juror holds out for acquittal, there can be no verdict of guilty. Roundtree's first trial ended with a hung jury, even though the proffered medical testimony was apparently not admitted.[37] As the always quotable and, I think, insightful Judge Irving Goldberg wrote for the court in *Chapman v. United States*, 547 F.2d 1240, 1250 (5th Cir.), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977),

> [t]he infusion of "harmlessness" into error must be the exception, and the doctrine must be sparingly employed. A minuscule error must coalesce with gargantuan guilt, even where the accused displays an imagination of Pantagruelian [38] dimension.

Even if this formulation reads the concept of harmless error a bit too narrowly—and Chapman's conviction was affirmed notwithstanding the judge's rhetorical flourish—I think we have something to learn from it. Before we sustain a denial of liberty to a citizen who was not permitted to present relevant evidence to the jury, we should be a good deal more satisfied than this record allows us to be that he would have been convicted anyway.

I emphasize that this is not a case like *Lemon v. United States*, 564 A.2d 1368 (D.C.1989), in which we found harmless error in spite of the prosecutor's "missing witness" argument in part because the absence from the stand of the witnesses in question "would have been obvious to the jury no matter what the prosecutor said." *Id.* at 1376. In a situation in which the jury has all of the evidence, we can generally have confidence in its sound judgment and ability to assess the case fairly. *See Boyde v. California*, —— U.S. ——, —— – ——, 110 S.Ct. 1190, 1200–01, 108 L.Ed.2d 316 (1990); *United States v. Cotter*, 60 F.2d 689, 692 (2d Cir.) (per Learned Hand, J.) *cert. denied*, 287 U.S. 666, 53 S.Ct. 291, 77 L.Ed. 575 (1932); *cf. Allen v. United States*, 579 A.2d 225, 239 (D.C.1990) (Schwelb, J., concurring in part and dissenting in part). In the present case, however, the jury did not have before it what I regard as important and probative evidence. Speculation as to what would have occurred if the jury had been aware of that evidence is hazardous. The doubt should be resolved in Roundtree's favor.

Since my colleagues are of the opinion that the judge correctly prohibited cross-examination of W.D. with respect to her prior allegations of sexual abuse, I have confined my discussion of harmless error to the issue of the condition and appearance of W.D.'s pubic area, with respect to which the majority assumes and more or less concedes that error occurred. I add only that if I am correct in my conclusion that the cross-examination of W.D. was impermissibly restricted, then the cumulative impact of the two erroneous rulings was surely so substantial that I do not think that my colleagues would seriously maintain that it was harmless.[39]

## IV

### THE SODOMY STATUTE

Although the notion that cunnilingus is a sodomitic act is not obvious from the text of the statute, *see* D.C.Code § 22–3502

---

**37.** I assume that if the first trial judge had ruled that evidence admissible, Roundtree's counsel would have brought this to the second judge's attention. The record does not disclose whether a similar proffer was made at the first trial.

**38.** Pantagruel, the hero of Francois Rabelais' 1526 novel bearing his name, is described as the coarsely humorous and gigantic son of Gargantua. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1631 (1966).

**39.** I have previously expressed my view that the trial judge's rulings on both issues were tainted by error of law, and that no remand is necessary to enable the judge to weigh probative value against prejudicial effect under the correct legal standards. Even under my colleagues' analysis of the issue relating to the exclusion of evidence regarding the appearance of W.D.'s genital area, however, it appears to me that a remand is required so that the judge can do the discretionary balancing without being misled by the palpably incorrect notion that the evidence is irrelevant.

(1989), I agree with the majority that we are bound to follow *United States v. Cozart*, 321 A.2d 342, 343 (D.C.1974), and to reject Roundtree's argument that this form of sodomy is not proscribed. *See* maj. op. at 329–331. I do wish to note my concern, however, as to another aspect of the statute which, in my view, may result in a palpable injustice which the legislature may never have intended, and which may present serious constitutional problems as well.[40]

Since sodomy is a crime to which consent is no defense, there are a great many people in the District of Columbia who commit it. *See* G. NASS & M.P. FISHER, SEXUALITY TODAY 135 (1988) (95% of males and females sometimes practice oral sex). See also A. KINSEY, SEXUAL BEHAVIOR IN THE HUMAN MALE, 576–77 (1948). On its face, the statute makes no exception for married couples. If every violator were sentenced to serve three to nine years, as Roundtree was, a great many more adults would be in jail than out of it. Obviously, such a statute is likely to be enforced only in cases in which there was either a sexual assault or some other aggravating circumstance, real or perceived. When the assailant goes to trial, however, the government can argue—as the prosecutor in this case did—that consent is no defense. The judge so instructs the jury. This effectively enables the government to prosecute a case of sexual assault without proving the assault.

In the present case, the government originally charged Roundtree with assault, but later dismissed that charge. Nevertheless, the sentence imposed—three to nine years—reflects the judge's view that Roundtree committed a serious crime. He was convicted, however, of an act which, if performed by consenting adults, is an everyday occurrence.

Aside from any issue of the constitutionality of a prohibition of consensual sodomy, *see generally Bowers v. Hardwick*, 478 U.S. 186, 190–96, 106 S.Ct. 2841, 2843–46, 92 L.Ed.2d 140 (1986), one might well ask whether any rational basis exists for a statutory scheme under which a forcible sexual assault and a voluntary act performed by consenting adults are treated identically. *See Greene v. United States*, 571 A.2d 218, 222 (D.C.1990). The potential for abuse is obvious. This state of affairs has little to do with justice, and I hope that a remedy will yet be found. *But see Gary v. United States*, 499 A.2d 815 (D.C.1985) (*en banc*) (describing congressional veto of District of Columbia sexual reform legislation) *cert. denied*, 477 U.S. 906, 106 S.Ct. 3279, 91 L.Ed.2d 568 (1986) *and* 475 U.S. 1086, 106 S.Ct. 1470, 89 L.Ed.2d 725 (1986).

## V

### THE CONVICTION OF TAMPERING WITH PHYSICAL EVIDENCE

Roundtree's notice of appeal specifies that he is appealing from both of his convictions. No argument was made in his brief with respect to the conviction of tampering with physical evidence, nor was the point argued orally.

In the present case, despite the mishandling by investigators of the paper bag which allegedly contained Roundtree's semen, the evidence of tampering against Roundtree was compelling. His defense was effectively reduced to absurdity—he did not know if his chicken sandwich bag was stapled shut or had the word "Evidence" written on it. The testimony against him in regard to that offense was provided exclusively by witnesses other than W.D.; she did not testify about it at all. Any impeachment of W.D.'s credibility would thus be irrelevant to the tampering conviction.

Moreover, Roundtree had ample reason to tamper with the evidence even if he was not guilty of sodomy. If, for example, W.D.'s account was only partially true—if she was compelled to participate in his masturbation, but if there was no cunnilingus—then Roundtree would not be guilty

---

**40.** Roundtree's counsel did not raise these problems and I content myself with noting their

existence.

of the specific crime with which he was charged, but would still have had ample motive to destroy or conceal the brown bag containing semen and soiled tissues.

In *Gethers v. United States*, 556 A.2d 201, 205 (D.C.1989), we recently held that where a defendant is convicted of two offenses and one conviction must be reversed, the second conviction can stand only if there was no "prejudicial spillover" from the first. It may at first blush appear incongruous to vote to sustain a finding of guilt in connection with a "cover-up" when I think the conviction of the crime sought to be concealed should be reversed. That seeming incongruity is dissipated, however, when one considers the evidence as a whole and, in particular, the lack of any relationship between W.D.'s testimony and the tampering offense. I discern no prejudicial spillover in this case. Accordingly, I would affirm Roundtree's conviction of tampering with physical evidence.[41]

## VI

## CONCLUSION

This is a difficult case. Reasonable people can, and do, hold differing views with respect to the legal issues presented. In my opinion, however, evidence was withheld from the jurors which could have substantially affected the credibility of the complaining witness and the plausibility of her account. Moreover, the failure of our statute to distinguish between forced and consensual sodomy is irrational and unjust.

I do not believe that Roundtree, who was found guilty and began a long term of imprisonment in August 1986, more than four years ago, received a fair trial. I respect my colleagues' contrary view, but regret that their conscientious consideration of the case has not led them to the same conclusion.

---

41. This offense is a felony for which an indeterminate sentence was required. *See* D.C.Code § 24–203(a) (1989). The determinate one-year sentence imposed by the judge was thus illegal. Accordingly, we should remand for resentencing on this count.